439 Mass. 643 (2003)                                    643

Hingham Healthcare Limited Partnership *v.* Division of Health Care Finance and Policy.

HINGHAM HEALTHCARE LIMITED PARTNERSHIP[1] & another[2] *vs.* DIVISION OF HEALTH CARE FINANCE AND POLICY & others.[3]

Suffolk. April 10, 2003. - June 26, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Medicaid. Health Care Facility. Nursing Home. Division of Health Care Finance and Policy. Practice, Civil,* Summary judgment. *Regulatory Agency. Constitutional Law,* Regulation, Taking of property, Contract clause.

In a civil action brought by two for-profit nursing homes challenging two amendments to the Medicaid reimbursement rate methodology regulations promulgated by the State division of health care finance and policy, the judge properly granted summary judgment in favor of the division, where the plaintiffs failed to demonstrate that the amendments either violated or conflicted with the existing statutory scheme [646-648]; that the amendments resulted in reimbursement rates that were confiscatory and deprived the plaintiffs of their property without just compensation in violation of art. 10 of the Massachusetts Declaration of Rights and the Fifth and Fourteenth Amendments to the United States Constitution [649-650]; or that the change in the reimbursement rates resulted in substantial impairment of their contractual relationships, in violation of the contract clause of the United States Constitution [650-651].

CIVIL ACTION commenced in the Superior Court Department on August 2, 2001.

The case was heard by *Carol S. Ball,* J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Roderick MacLeish, Jr.* (*Gary R. Greenberg & Jonathan D. Cohen* with him) for the plaintiffs.

---

[1]Doing business as Harbor House Nursing and Rehabilitation Center (Harbor House).

[2]West Bridgewater Medical Investors Limited Partnership, doing business as Life Care Center of West Bridgewater (Life Care).

[3]The commissioner of the division of health care finance and policy and the Commonwealth. We shall refer to a single defendant.

*William E. Reynolds*, Assistant Attorney General (*Ronald F. Kehoe*, Assistant Attorney General, *& Juliana deHaan Rice*, Assistant Attorney General, with him) for the defendants.

IRELAND, J. The plaintiffs, two for-profit nursing homes, appeal the entry of summary judgment in favor of the defendant. We granted the plaintiffs' application for direct appellate review. They contend that 1998 and 2000 amendments to the Medicaid reimbursement rate methodology regulations, promulgated by the defendant, were in excess of the defendant's statutory authority because the new rates fail to provide adequate compensation for Medicaid patients, violate G. L. c. 111, §§ 25B-25G, are confiscatory, and violate the contract clause of the United States Constitution. Because we conclude that neither the rate amendments promulgated by the defendant involving the capital component, nor the reimbursement rate as a whole violates the defendant's express statutory authority, we affirm.

1. *Facts.*

General Laws c. 118G, § 7, governs the annual rates of reimbursement to nursing homes for care of Medicaid patients,[4] and provides in relevant part:

> "In establishing rates of payment to providers of services, the division shall control rate increases and shall impose such methods and standards as are necessary to ensure reimbursement for those costs which must be incurred by efficiently and economically operated facilities and providers. Such methods and standards may include, but are not limited to the following: peer group cost analyses; ceilings on capital and operating costs; productivity standards; caps or other limitations on the utilization of temporary nursing or other personnel services . . . . Each rate established by the division shall be deemed a regulation and shall be subject to review as hereinafter provided."[5]

In response to this mandate, the defendant adopted regula-

---

[4]The parties do not dispute that the plaintiffs are legally obligated to admit and care for patients who receive Medicaid funding.

[5]This language, formerly in G. L. c. 6A, § 32, repealed by St. 1996, c. 151, § 31, was recodified in 1996 when the Rate Setting Commission was reconstituted as the division of health care finance and policy. The division then became responsible under G. L. c. 188G, inserted by St. 1996, c. 151,

tions for nursing facilities that established a universal Medicaid reimbursement rate methodology that shifted away from a cost-based approach. See 114.2 Code Mass. Regs. §§ 6.00 (2000). Under the pre-1998 cost-based approach, nursing homes would receive reimbursements particular to their historical facility-specific costs, resulting in a wide range of payment rates with little incentive to reduce costs. In an effort to encourage efficiency, the defendant initiated changes in the reimbursement system.

The current rate paid to nursing facilities for care rendered to Medicaid patients in the Commonwealth is calculated using a three-component methodology comprised of nursing, capital, and operating costs. Each component is calculated separately, and then added together to arrive at a single per patient-day reimbursement rate. The capital component comprises approximately eleven per cent of the total reimbursement rate.

In 1998, the defendant altered the capital component by establishing a uniform capital payment of $17.29 per patient-day for all Massachusetts facilities. In arriving at this number, the defendant commissioned a study that determined the average cost of constructing a nursing facility in the Commonwealth, amortized over forty years, allowing for an annual rate of return of 8.375 per cent, and reimbursement of real estate taxes.[6] In response to concerns raised by the Massachusetts Extended Care Federation, the defendant adopted a guideline whereby facilities that had been constructed recently, like the plaintiffs', could in the alternative receive ninety per cent of their actual 1997 capital costs in 1998.[7] In other words, the plaintiffs have

___

§ 275, for setting, on a yearly basis, the rates paid by the Commonwealth to nursing facilities for health care services provided to Medicaid recipients.

[6]The firm that performed the study used Massachusetts-specific indices to conclude that the average total cost of constructing a nursing home in Massachusetts was $60,575.85 a bed in 1998. Amortized over forty years (ten years for equipment) and allowing for an annual rate of return of 8.375 per cent, this resulted in a $15.68 per-bed per patient-day cost. The defendant then added median building insurance and property tax expenses to reach the final $17.29 figure.

[7]The reason for this was the apparent concern that nursing homes recently constructed pursuant to a determination of need (DoN) issued before March 7, 1996, would not be adequately reimbursed by the potentially sudden drop to

not been limited to the $17.29 capital component, but rather receive ninety per cent of their actual 1997 capital costs.

The 2000 amendment affected the reimbursement rate of a sub-component of the capital component, namely interest costs on the mortgage a facility takes to finance construction. Prior to this regulation, facilities had an incentive to continue to borrow and not reduce financing costs, because mortgage interest was a fully reimbursable capital cost. The revised method provides a flat rate of payment for mortgage interest for all nursing facilities, set at 7.625 per cent a year of a facility's allowable net book value.

In order to ease the transition from the cost-based reimbursement system, both the 1998 and 2000 amendments were subject to a total payment adjustment that ensured that if, under the new methodology, a facility's reimbursement rate decreased, the facility would still receive the same weighted over-all rate as in the previous year. The purpose of this system was to decrease the impact of the new rate methodology. In fact, the plaintiffs' rates increased at a rate higher than that of inflation over the rate years between 1997 and 2001. Additionally, Life Care Centers of West Bridgewater refinanced its mortgage subsequent to the effective dates of the amendments, resulting in a substantial reduction of its interest rate.

2. *General Laws c. 118G.*

The Superior Court granted the defendant's motion for summary judgment, ruling that the 1998 and 2000 amendments did not violate G. L. c. 118G. Summary judgment will be upheld when, "viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law." *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991). On appeal, the plaintiffs claim that the 1998 and 2000 amendments result in an over-all rate that violates the substantive

---

$17.29. A nursing home must receive a DoN from the Department of Public Health prior to making capital expenditures to construct its facilities. See G. L. c. 111, § 25C. The DoN authorizes a provider to spend up to a certain amount of capital, a maximum capital expenditure (MCE), for construction. Nothing in a DoN, however, guarantees any future capital component reimbursement rate for services provided to Medicaid patients at the facility. *Id.*

requirements of c. 118G. In particular, the plaintiffs claim that by normalizing the capital component of the medicaid reimbursement rate, the defendant violated c. 118G because the resulting rate fails to "ensure reimbursement for those costs which must be incurred by efficiently and economically operated facilities and providers," as required by G. L. c. 118G, § 7.

Section 9 of G. L. c. 118G provides that judicial review of a challenged reimbursement rate is to be governed by G. L. c. 30A, § 14. Pursuant to G. L. c. 30A, § 14 (7), a court may modify the decision of the agency (defendant) if the agency's decision is in violation of constitutional provisions, exceeds its statutory authority, or is "[a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law." In addition, the court shall "give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." *Id.*

While the plaintiffs assert that the 1998 and 2000 amendments to the capital component invalidate the reimbursement rate, it is the rate as a whole that must be examined to determine whether the defendant violated G. L. c. 118G in promulgating the amendments. Cf. *Massachusetts Hosp. Ass'n* v. *Department of Pub. Welfare*, 419 Mass. 644, 653 n.9 (1995) (under "Boren Amendment" [42 U.S.C. § 1396a(a)(13)(A)] scope of review of reimbursement rate limited to rate as a whole not individual components).[8] Although it is foreseeable that one component of a reimbursement rate methodology could render the rate as a

---

[8]The Boren Amendment was enacted by the Congress in an effort to regulate State Medicaid reimbursement rates for medical services. See *Quincy City Hosp.* v. *Rate Setting Comm'n*, 406 Mass. 431, 447-448 (1990) (and cases cited). While it was repealed in 1997 [See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4711, 111 Stat. 251, 507-508 (1997)] the logic behind reviewing the entire Medicaid reimbursement rate set by a rate setting commission remains unchanged. See *Massachusetts Hosp. Ass'n* v. *Department of Pub. Welfare*, 419 Mass. 644, 653 n.9 (1995). It is important to note, however, that the Boren Amendment contained fundamental differences regarding the methods and power of rate setting by the State Medicaid agencies. Cf. *AMISUB (PSL), Inc.* v. *Colorado Dep't of Social Servs.*, 879 F.2d 789, 794 (10th Cir. 1989), cert. denied, 496 U.S. 935 (1990). The Boren Amendment required " 'findings' which identify and determine efficiently and economically operated hospitals," *id.* at 796, while G. L. c. 118G, § 7, authorizes the defendant to "control rate increases and . . . impose such methods and standards." Because G. L. c. 118G requires no such "findings," but allows for "peer

whole inadequate, that is not the situation here. Under G. L. c. 118G, the defendant was specifically authorized to use "peer group cost analyses [and] ceilings on capital and operating costs." G. L. c. 118G, § 7. The defendant used peer group analyses to determine median capital costs for nursing facilities in the Commonwealth and then effectively set a "ceiling" on capital costs. Once the rate of $17.29 was calculated, the defendant adopted a suggestion from the Massachusetts Extended Care Federation that lessened the impact of the regulation by allowing nursing homes, such as the plaintiffs', to recover ninety per cent of the their actual capital costs. Over the rate periods in question, the plaintiffs are attempting to invalidate an entire rate on the claim that only ninety per cent of what amounts to an eleven per cent component of the entire reimbursement rate was covered.

The ultimate goal of the 1998 and 2000 amendments was to encourage efficient operation of nursing facilities. Under the cost-based approach, institutions had little incentive to cut costs, because spending more led to a higher reimbursement rate. We cannot say that using statistical data to arrive at a median capital component was arbitrary or capricious. The plaintiffs make much of the fact that the defendant should have created different capital reimbursement rates that correspond to the location of the nursing facility. The plaintiffs contend, for example, that the defendant should have used median capital costs for nursing homes situated in urban locations versus rural locations. The statute, however, authorizes "peer group cost analyses," but does not define the peer group. Logically, this determination lies in the discretion of the defendant, and unless arbitrary or capricious, we will not disturb it.

3. *General Laws c. 111, §§ 25B-25G.*

As previously stated, see note 7, *supra,* providers must obtain a determination of need (DoN) prior to making a substantial capital expenditure for construction of a health care facility. See G. L. c. 111, § 25C. The plaintiffs claim that the 1998 and 2000 amendments conflict with the DoN procedure that sets the

group cost analyses," and "ceilings on capital. . . costs," it is inappropriate to review the actions of the defendant as if they were performed under the Boren Amendment.

maximum capital expenditure (MCE). The plaintiffs claim that the new rate methodology reduces the capital portion of the rate that was financed in reliance on the DoN. A DoN, however, does not guarantee repayment or reimbursement for the capital expenditure in building a nursing home, nor does it guarantee that building a facility within the MCE will be a sound financial proposition. See G. L. c. 111, § 25C. Therefore, contrary to the plaintiffs' assertion, there is nothing about a DoN that is in conflict with the 1998 and 2000 amendments.

4. *Constitutional Claims.*

a. *Confiscation.* The plaintiffs claim that the 1998 and 2000 amendments are confiscatory and deprive them of their property without just compensation in violation of art. 10 of the Massachusetts Declaration of Rights and the Fifth and Fourteenth Amendments to the United States Constitution, as the reimbursement rates are not adequate to cover their capital costs. The plaintiffs claim that because nursing homes are required to accept Medicaid patients, and are also required to obtain DoN's from the Department of Public Health before construction, a confiscation claim is properly before the court. In *Massachusetts State Pharm. Ass'n* v. *Rate Setting Comm'n*, 387 Mass. 122, 136 n.13 (1982), this court stated that "[t]here is a substantial question whether a pharmacy or other provider has any constitutional claim that a rate of reimbursement is confiscatory." Assuming, arguendo, that the confiscatory claim is applicable to Medicaid reimbursement rates, the plaintiffs still fail to demonstrate confiscation under a regulatory taking analysis.

When a regulatory taking involves neither a physical invasion nor complete deprivation of use, "Federal law has established several interrelated factors which are to be considered in determining whether a compensable taking has occurred: '(1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." ' " *Daddario* v. *Cape Cod Comm'n*, 425 Mass. 411, 415-416, cert. denied, 522 U.S. 1036 (1997), quoting *Leonard* v. *Brimfield*, 423 Mass. 152, 154, cert. denied, 519 U.S. 1028 (1996). "This court will not interfere with the

exercise of the rate making power unless confiscation is clearly established on the record before us." *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 10-11, cert. denied, 439 U.S. 921 (1978).

The record before us does not support the plaintiffs' claim of a confiscatory rate. The 1998 and 2000 amendments only affect an extremely small portion of the entire rate of reimbursement, in a way that complied with the statutory mandate of G. L. c. 118G. Additionally, under the total payment adjustment, the plaintiffs did not actually receive a reduction in rate, and in fact, the plaintiffs' over-all rates increased by 18.2 per cent (Harbor House) and 13.5 per cent (Life Care) between 1997 and 2001. Even under a traditional confiscation analysis, the plaintiffs have not provided sufficient evidence that the over-all rate of reimbursement is so low as to require them to "submit to confiscatory rates or go out of business." *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.*, 358 Mass. 272, 280-281 (1970).

b. *Contract clause.* The plaintiffs claim that the 1998 and 2000 amendments substantially impair their obligations under financing arrangements and mortgage agreements that they entered into under the preamendment rate scheme, and that therefore these amendments violate the contract clause of the United States Constitution. To succeed, the plaintiffs must first demonstrate that (1) a contractual relationship exists; (2) the relationship is impaired by a change in the law; and (3) the resulting impairment is substantial. See *National Ass'n of Gov't Employees* v. *Commonwealth*, 419 Mass. 448, 450, cert. denied, 515 U.S. 1161 (1995). A regulation, however, "does not violate the Contract Clause simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment." *Arthur D. Little, Inc.* v. *Commissioner of Health & Hosps. of Cambridge*, 395 Mass. 535, 555-556 (1985), quoting *Exxon Corp.* v. *Eagerton*, 462 U.S. 176, 190 (1983).

The plaintiffs contend that they relied on the DoNs in constructing their facilities, and are no longer receiving reimbursement sufficient to cover their mortgage payments. The plaintiffs claim that the 1998 and 2000 amendments have thus substantially impaired their mortgage contracts with their lenders made in reliance on their DoNs.

This claim is without merit. Both plaintiffs were on notice that rates of reimbursement could be altered on a year-to-year basis, pursuant to G. L. c. 118G, and chose to enter into mortgage agreements with that knowledge. Moreover, one of the plaintiffs (Life Care) refinanced its existing mortgage after the amendments took effect to lower its interest rate significantly. The plaintiffs have failed to show that the change in the reimbursement rate resulted in substantial impairment of their contractual relationships.[9]

5. *Conclusion.*

Because the 1998 and 2000 amendments by the defendant were not arbitrary or capricious, nor in violation of any constitutional provision, summary judgment for the defendant is affirmed.

*So ordered.*

---

[9]Even if the amendments impaired the plaintiffs' mortgages, "an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." *Massachusetts Community College Council* v. *Commonwealth*, 420 Mass. 126, 132 (1995), quoting *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 25 (1977). The defendant was following a legislative mandate to control reimbursement in an important, and highly regulated, industry. Nothing the defendant has done is in violation of the statutorily conferred power of G. L. c. 118G, and thus the 1998 and 2000 amendments may be deemed reasonable and necessary actions by the defendant.