448 Mass. 365 (2007) 365

Salisbury Nursing & Rehabilitation Center, Inc. *v.* Division of Administrative Law Appeals.

SALISBURY NURSING & REHABILITATION CENTER, INC. *vs.*
DIVISION OF ADMINISTRATIVE LAW APPEALS & another.[1]

Suffolk. January 4, 2007. - February 15, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Division of Administrative Law Appeals. Medicaid. Division of Health Care
Finance & Policy. Health Care Facility. Nursing Home. Regulatory Agency.
Administrative Law,* Rate regulation. *Regulation. Jurisdiction,* Declaratory
relief.

In a civil action challenging the validity of regulations governing Medicaid
rate calculations for nursing homes in 1998 and 1999 and the application
of those rates to the plaintiff nursing home, this court concluded that ap-
plication of a negative total payment adjustment (which capped rate
increases) to the plaintiff's own rate calculation did not result in the use of
an illegal base year [369-371]; that the regulation imposing total payment
adjustments bore a rational relationship to the agency's statutory authority
and directive and was therefore substantively valid, the plaintiff having
failed to demonstrate the absence of any conceivable ground upon which
the regulation could be upheld [371-374]; and that the defendant division
of administrative law appeals did not have jurisdiction to hear the plaintiff's
substantive challenge to the regulations [374-376].


CIVIL ACTION commenced in the Superior Court Department on
December 17, 2003.

The case was heard by *Diane M. Kottmyer,* J., on a motion
for judgment on the pleadings or for summary judgment.

The Supreme Judicial Court granted an application for direct
appellate review.

*Kenneth A. Behar (Edward D. Kalman* with him) for the
plaintiff.

*William W. Porter,* Assistant Attorney General, for the
defendants.

CORDY, J. In this case, we consider the validity of the regula-
tions that governed Medicaid rate calculations for nursing homes

---

[1]Division of Health Care Finance and Policy.

in 1998 and 1999, and the application of those rates to the plaintiff, Salisbury Nursing Home & Rehabilitation Center, Inc. (Salisbury). We affirm both the regulations and their application to Salisbury. We also decline Salisbury's invitation to modify the jurisdictional test we have developed to determine whether the division of administrative law appeals (DALA) has jurisdiction of rate appeals like Salisbury's, where the challenge, although phrased as an attack on an individual calculation, is in effect a challenge to the substantive regulation.

1. *Background.*[2] a. *Parties.* Salisbury is a nursing home in Worcester. Its patients include both private payers and Medicaid recipients. During the times relevant to this appeal, the rates of payment for care of Medicaid patients were set by the defendant division of health care finance and policy (division). See G. L. c. 118G, § 2 (*b*), inserted by St. 1996, c. 151, § 275, repealed by St. 2003, c. 26, § 338.[3] The defendant DALA hears appeals from rate setting decisions. See G. L. c. 118G, § 9.[4]

b. *Statutory and regulatory framework.* The division has the power "to establish certain rates of payment for health care services." G. L. c. 118G, § 2 (*b*). The rates must be "reasonable and adequate to meet the costs which are incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable state and federal law, regulations and quality and safety standards, and which are within the financial capacity of the commonwealth." *Id.*

The statute also mandates that the division "control rate increases," to which end it must "impose such methods and

---

[2]In its appeal to the Superior Court, Salisbury sought judicial review of the division of health care finance and policy's (division) administrative decision under G. L. c. 30A. In accordance with G. L. c. 30A, § 14 (4) and (5), the division assembled and filed that record for review by the Superior Court. That record is now before us, and provides the factual basis of our review. See G. L. c. 30A, § 15.

[3]The rates are now set directly by the Secretary of Health and Human Services rather than by the division. See St. 2003, c. 26, §§ 338, 339. That change is irrelevant here. For convenience, we shall speak of the division's power to set rates in the present tense rather than the past.

[4]The provision allowing for review of the division's rate calculations before DALA formerly appeared in G. L. c. 6A, § 36. It was recodified by St. 1996, c. 151, §§ 31 and 275. That change has no effect on the holdings of our earlier cases, which refer to G. L. c. 6A.

standards as are necessary to ensure reimbursement for those costs which must be incurred by efficiently and economically operated facilities and providers. Such methods and standards may include, but are not limited to the following: peer group cost analyses; ceilings on capital and operating costs; . . . the revision of existing historical costs bases, where applicable, to reflect norms or models of efficient service delivery; and other means to encourage the cost-efficient delivery of services." G. L. c. 118G, § 7, third par.

The regulations establishing rates for 1998 and 1999 appeared at 114.2 Code Mass. Regs. §§ 6.00. This appeal concerns only those two years. During that time, the division was making a transition between two different rate setting methodologies. In years prior to 1998, the division calculated rates based on a "prospective rates" system. That system used a facility's actual costs and patient acuity figures for a "base year," and then adjusted them annually to account for inflation and certain other permissible adjustments and ceilings. It did not compare a facility's costs to the costs of other facilities or to market rates. By statute, the "base year" used could be no more than four years prior to the rate year. G. L. c. 118G, § 7, second par. Accordingly, the regulations for 1998 and 1999 set the base year at 1996. Starting in 1998, the division adopted a "standard rates" system, which set rates with reference to the expected market costs of three categories of care: nursing costs, operating costs, and capital costs. This change was designed to encourage economic efficiency in the operation of nursing homes. See *Hingham Healthcare Ltd. Partnership* v. *Division of Health Care Fin. & Policy*, 439 Mass. 643, 645 (2003) (*Hingham Healthcare*).

To implement the transition from prospective rates to standard rates, the 1998 and 1999 regulations calculated rates by blending the two formulas. This transitional rate scheme also included a provision known as the "total payment adjustment" (TPA). The TPA was designed to answer the concerns of facilities that the new system might lower their payments without providing time to adjust. See *Hingham Healthcare, supra* at 646. Accordingly, if the rate calculation resulted in a facility's receiving a 1998 rate that was lower than its 1997 payment rate, the 1997

level would be maintained (positive TPA). To offset the cost of the positive TPA, the TPA provision also capped rate increases (negative TPA) between 1997 and 1998 at nine per cent, and between 1998 and 1999 at six per cent. Salisbury was subject to a negative TPA in 1998 (as were eighty-three other facilities) and in 1999 (as were 107 other facilities). A positive TPA was applied to the rates of 117 facilities in 1998 and thirty-six facilities in 1999.

c. *Prior proceedings.* Salisbury first challenged its 1998 rates by filing a notice of claim for adjudicatory proceeding with DALA on May 28, 1998, alleging that its proposed rates were unfair, did not reasonably and adequately meet costs, and were based on an illegal base year. The challenge was later amended to encompass Salisbury's 1999 rates as well. A DALA administrative magistrate held hearings over three days in June, August, and October, 2001, and issued a decision on July 2, 2003. He affirmed the division's 1998 and 1999 rate calculations for Salisbury, concluding that the division had not used an unlawful base year and that Salisbury had failed to show that its rates were not "fair, adequate and reasonable." The magistrate also noted that DALA has jurisdiction over challenges to the correctness of the application of the regulations to a facility, but not over "challenge[s] to the regulatory structure" as such. In other words, DALA could overturn Salisbury's individual rate calculation, but not the rate setting regulation. The magistrate concluded that "this appeal involves a thinly disguised, frontal attack on the [TPA] regulations by Salisbury." Thus, he concluded, DALA lacked jurisdiction.

Salisbury then filed the present action in the Superior Court. The complaint sought judicial review, under G. L. c. 30A, § 14, of DALA's decision (including its conclusion that it lacked jurisdiction) (count 1) and a declaratory judgment, under G. L. c. 30A, § 7, regarding the validity of the division's regulations (in particular the TPA provision) (count 2). The defendants answered by denying Salisbury's legal claims, asserting various defenses, and asking the court to declare the division's regulations valid. On Salisbury's motion for judgment on the pleadings or summary judgment, the judge ordered judgment for the division and DALA. On count 1, she ruled that DALA did not

have jurisdiction to consider Salisbury's appeal. On count 2, she found that Salisbury had failed to establish that the regulations violated G. L. c. 118G, § 7, or any other applicable law, or that they lacked a rational basis. We granted Salisbury's application for direct appellate review.

On appeal, Salisbury makes two substantive challenges to the regulations. First, it claims that the application of the negative TPA in 1998 and 1999 subjected it to an illegal base year in violation of G. L. c. 118G, § 7. Second, it argues that the TPA regulations are illegal, arbitrary, and capricious. Salisbury also claims that DALA incorrectly concluded that it lacked jurisdiction of its appeal, and makes a subsidiary argument attacking the jurisdictional test we have established for appeals to DALA. We consider the challenges to the regulation in turn, and then discuss the jurisdictional question.

2. *Base year.* Salisbury argues that the application of the negative TPA to its 1998 and 1999 rates resulted in the use of an illegal base year, 1993, rather than the division's stated base year of 1996. Section 9 of G. L. c. 118G provides that judicial review of rates is governed by the standards of G. L. c. 30A. Under G. L. c. 30A, § 14 (7) (*g*), a court may modify or set aside a rate decision if it is "[a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law."[5] We must therefore determine whether the application of the TPA in fact resulted in the use of an illegal base year, which would make Salisbury's rate calculation "not in accordance with law."

As described above, the prospective rate system works by making an annual adjustment (including inflation) to the rates for a prior year. The "base year" calculation serves to keep the rates paid to facilities under a prospective system in line with actual costs incurred. The relevant statutory provision is found in G. L. c. 118G, § 7, second par., which provides:

> "In setting such prospective or retrospective rates of reimbursement, [the division] shall use as base year costs for rate determination purposes the reported costs of the calendar year not more than four years prior to the current

---

[5]Salisbury's base year argument does not implicate any of the other factors for overturning a decision listed in G. L. c. 30A, § 14 (7).

rate year, adjusted for reasonableness and to incorporate any audit findings applicable to said base year costs; provided, however, that no base year cost shall be incorporated unless a comprehensive desk audit has been completed for the costs incurred in that base year."

As a result, a facility's costs must be audited at least every fourth year, and those audited costs used to calculate rates paid for up to the next four years.

To calculate Salisbury's rates for 1998 and 1999, the division contends that it used 1996 as the base year, which is within the four-year statutory requirement. In both years, the initial rate calculations yielded increases above the capped level (nine per cent in 1998, six per cent in 1999), resulting in the application of a negative TPA to Salisbury's rates for both years. Salisbury contends that the effect of applying the negative TPA was to "throw out" its audited 1996 data when calculating the 1998 rates, because the cap meant that the 1998 rates were in reality calculated by applying a nine per cent increase to 1997 rates, which in turn were established using 1993 as the base year. Thus, it argues, 1993 was the actual base year used to establish its 1998 rates, and the application of the TPA in 1999 carried the problem forward into that year as well.

This argument is unavailing, both factually and analytically. The DALA magistrate found as a matter of fact that the negative TPA was not applied until after the division had done its base rate calculation using 1996 as the base year, as the statute required. That finding is supported by substantial evidence in the record. Once that portion of the calculation was complete, the division had complied with the mandate of the base year provision in the statute.[6]

Salisbury is correct that the negative TPA did involve a mathematical relationship between its 1997 and 1998 rates. However, the claim that this relationship effectively changed the base year misconstrues the purpose of the base year require-

---

[6]The division presented evidence that if it had used 1993 as the base year, and applied all of the applicable inflation and other adjustments, Salisbury's 1998 per diem rate would have been $90.18, less than the $93.76 it actually received as the result of applying the TPA nine per cent cap on increases over the 1997 rate.

ment: to ensure that rates are calculated against a periodically audited measure of a facility's actual costs. The base year provision does not require that one year's costs bear absolutely no relation (say, through a TPA-like cap) to a prior year's costs if those two years have different base years. Salisbury's argument also misapprehends the way that the statute requires the base year figures be used: as a starting point. The TPA did not affect the starting point calculation. It was an adjustment applied at the end of the calculation.

We conclude that the application of the negative TPA to Salisbury's rate calculation did not result in the use of an illegal base year. The rate calculation was properly affirmed by both DALA and the Superior Court.

3. *Validity of the regulations.* In addition to its objection to the application of the TPA to its own rate calculation, Salisbury challenges the validity of the TPA regulation generally. Such a challenge is properly brought in the Superior Court as an action for declaratory judgment. G. L. c. 30A, § 7.[7] See *Massachusetts State Pharm. Ass'n* v. *Rate Setting Comm'n*, 387 Mass. 122, 126 (1982) (*Pharm. Ass'n*) (plaintiff may maintain challenge to rate setting regulation pursuant to G. L. c. 30A, § 7). The standard of review applicable in a review of regulations is well established, "namely, whether the regulations are illegal, arbitrary, or capricious." *Beth Israel Hosp. Ass'n* v. *Rate Setting Comm'n*, 24 Mass. App. Ct. 495, 505 (1987) (*Beth Israel*), citing *Pharm. Ass'n, supra* at 126-127.

"The plaintiff has the burden of showing that the regulation is invalid or illegal." *Pharm. Ass'n, supra* at 126, citing *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 851 (1977) (*Consolidated Cigar*). To do so, the plaintiff must establish the "absence of any conceivable ground" upon

---

[7]General Laws c. 30A, § 7, provides: "Unless an exclusive mode of review is provided by law, judicial review of any regulation or of the sufficiency of the reasons for its adoption as an emergency regulation may be had through an action for declaratory relief in the manner and to the extent provided under chapter two hundred and thirty-one A[, the Declaratory Judgment Act]." Note that this is distinct from review of the determination of a particular provider's rates in accordance with the general regulation, which under the terms of G. L. c. 118G, § 9, sixth par., is considered in accordance with G. L. c. 30A, § 14 (appeals from final decisions of agencies in adjudicatory proceedings).

which the regulation may be upheld. *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 771 (2002) (*MFT*), quoting *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 776 (1980). This is because "[w]e accord to a regulation, including a rate regulation, the same deference we extend to a statute." *Pharm. Ass'n, supra* at 127, citing *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.*, 377 Mass. 282, 293-294 (1979). See *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 138 (1949) (regulation stands on same footing as authorizing statute, and court must make all presumptions in favor of validity). In conducting our review, "we must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *MFT, supra* at 771, quoting *Consolidated Cigar, supra* at 855.

Salisbury's challenge to the substance of the regulation rests partly on the same claim that it makes in its as-applied challenge: that the TPA results in the application of an illegal base year. As explained above, this argument must fail. Salisbury also contends that the TPA regulations violate the requirement that the division "shall impose such methods and standards as are necessary to ensure reimbursement for those costs which must be incurred by efficiently and economically operated facilities and providers." G. L. c. 118G, § 7, third par.[8] It claims that the effect of the TPA is just the opposite, to "penalize providers which, like Salisbury, were efficiently operated."

Salisbury has not met its burden of showing that there is no ground on which to uphold the TPA regulation. Indeed, the cap on rate increases imposed by the TPA constitutes a rational method for fulfilling the statute's instruction that the division "shall control rate increases." G. L. c. 118G, § 7, third par. Even if Salisbury were correct in its claim that the TPA regulations are poorly designed with respect to "efficiently operated"

---

[8]This language is substantially similar to that describing the duty of the division to establish rates "which are reasonable and adequate to meet the costs which are incurred by efficiently and economically operated facilities." G. L. c. 118G, § 2 (*b*). Our discussion here applies equally to the similar phrases in §§ 2 and 7.

facilities, that is not sufficient to defeat the regulation. The question here is not whether the TPA is the best or most sensible way to control costs, but whether it bears a rational relationship to the agency's statutory authority and directive. Clearly it does. In reviewing a regulation, this court does not substitute its judgment concerning the wisdom of the regulation for that of the agency.

Salisbury repeatedly claims that it was economically efficient in the mid-1990's, and that the TPA formula irrationally punishes that efficiency in the way that it calculates the rate cap. This argument has two problems. First, it lacks substantial factual support in the record. There is no systematic presentation of Salisbury's costs and other economic performance measures relative to similar facilities. In other words, we have no way to assess whether the claim has any factual merit, and on what standard.

Second, Salisbury's claimed "efficiency" is not relevant to the validity of the TPA rate formula. As the defendant agencies argue, the statute's requirement that rates cover costs of "efficiently and economically operated facilities" is a reference to general costs in the market. The rates, that is, must relate to actual market costs. There is no argument that they do not. This phrase is not a reference to the specific costs of any given facility, or to that facility's claim that it is economically efficient.

Salisbury's challenge bears a striking resemblance to an earlier case where we affirmed another portion of the division's 1998 rate regulation. In *Hingham Healthcare, supra* at 646-648, a facility challenged the division's method for calculating capital reimbursement costs. The facility argued that the division did not adequately account for variations in costs that arise from different site locations (e.g., rural versus urban facilities). *Id.* at 648. This is essentially Salisbury's argument about the TPA: that the 1998 regulations, by using a generalized methodology to calculate different components of rates, do not sufficiently account for the unique financial structures of different facilities.

Here, as in the *Hingham Healthcare* case, we defer to the division's determination as to how best to account for differences among facilities. Once a court has determined that a regulation satisfies the statutory requirements, the task of judicial review

is done. We will not otherwise inquire into the details of how a regulation operates in practice, or the degree of precision with which its application takes into account the many variations it may encounter. "Logically, this determination lies in the discretion of [the division], and unless arbitrary or capricious, we will not disturb it." *Id.* "It is not our function to consider the expediency of an enactment or the wisdom of its provisions." *MFT, supra* at 772, quoting *Commonwealth* v. *Henry's Drywall Co.,* 366 Mass. 539, 544 (1974). Salisbury cannot meet its burden by arguing that the TPA caused it financial harm, or that the regulation could have been drafted in a way that would have caused less harm. Neither of these, even if true, would make the regulation arbitrary or capricious. To make such a showing, Salisbury must demonstrate "the absence of any conceivable grounds upon which [the TPA] may be upheld." *Purity Supreme, Inc.* v. *Attorney Gen.,* 380 Mass. 762, 776 (1980), quoting *Colella* v. *State Racing Comm'n,* 360 Mass. 152, 156 (1971). It has failed to do so. Therefore, the judge properly declared the TPA regulations substantively valid.[9]

4. *Jurisdiction of DALA.* Finally, Salisbury challenges the Superior Court's conclusion that DALA did not have jurisdiction of its appeal.[10] Our cases have developed a jurisdictional test to determine when DALA has jurisdiction to hear a rate appeal under G. L. c. 118G, § 9. This test is necessary because in cases "where a provider's challenge is to the substantive validity, that is, the adequacy, of a regulation of general application and not to the peculiar application of that regulation to the provider, [DALA] is without authority to act, and the remedy for the provider is to proceed by way of an action for declaratory judgment under G. L. c. 30A, § 7, and G. L. c. 231A." *Rate Setting Comm'n* v. *Division of Hearings Officers,* 401

---

[9]Salisbury also asserts that the TPA regulations implicate due process, equal protection, and confiscation claims; but it does not elaborate on these arguments in any way sufficient for us to address them. We note that in *Hingham Healthcare Ltd. Partnership* v. *Division of Health Care Fin. & Policy,* 439 Mass. 643, 649-651 (2003), we rejected a similar constitutional claim against this same regulation. In any case, Salisbury did not raise any of these constitutional claims in the Superior Court. We therefore consider them waived.

[10]The DALA magistrate concluded similarly with respect to Salisbury's substantive challenge to the regulation.

Mass. 542, 544-545 (1988) (*Hearings Officers*), quoting *Beth Israel, supra* at 503. In other words, DALA may properly hear challenges to specific rate calculations, but it may not entertain substantive attacks on the rate regulations themselves. Substantive attacks include challenges like Salisbury's which, although phrased as an appeal from an individual rate determination, are in fact a challenge to substantive regulations. See *Beth Israel, supra* at 503-504 n.16 (noting problem of distinguishing as applied from substantive challenges).

We most recently stated the DALA jurisdictional test in *Rate Setting Comm'n* v. *Baystate Med. Ctr.*, 422 Mass. 744 (1996) (*Baystate*). The test asks two questions. First, were there special circumstances making application of the rate to a particular provider different from its application to all others? Second, were those circumstances the result of something other than voluntary business decisions? See *id.* at 748. See also *Rate Setting Comm'n* v. *Faulkner Hosp.*, 411 Mass. 701, 705 (1992); *Hearing Officers, supra* at 547; *Medi-Cab of Mass. Bay, Inc.* v. *Rate Setting Comm'n*, 401 Mass. 357, 363-364 n.9 (1987) (*Medi-Cab*); and *Rate Setting Comm'n* v. *Baystate Med. Ctr., Inc.*, 30 Mass. App. Ct. 553, 557 (1991). The jurisdictional test limits appeals to DALA to situations in which "the provider can demonstrate circumstances — other than voluntary business decisions — which make application of the rate to that provider *different* from its application to all other providers in the class." *Hearings Officers, supra* at 545, quoting *Medi-Cab, supra*.

We consider whether a facility has shown "special circumstances" by examining how application of the regulation to that facility "compares to other [facilities] of the same sort." *Baystate, supra* at 749. We look for factors "beyond the provider's control, which affect the provider but not the class as a whole." *Hearings Officers, supra* at 545. In *Hearings Officers, supra* at 545-546, we provided a list of situations that might qualify as special circumstances, all of which involve factors external to the provider affecting the context in which its business operates.[11] Salisbury has not shown that any of these apply to it. Nor has Salisbury provided any other example of how applica-

---

[11]"For example, a particular provider may service an area containing an unusually high concentration of patients with extreme health care needs; may

tion of the negative TPA to its rates differed from its application to other facilities. Salisbury's unique cost data do not qualify as a special circumstance — if they did, then all providers would face "special circumstances" and the test would be meaningless. See *Beth Israel, supra* at 503. Similarly, Salisbury's purported "efficiency" (in addition to being unproven, as discussed above) does not constitute a special circumstance, as it does not involve external pressures in Salisbury's business environment.

In short, there was nothing peculiar to the application of the TPA to Salisbury's rates that distinguish Salisbury from all of the other facilities subject to a negative TPA.[12] The DALA magistrate therefore correctly noted that Salisbury's attack was substantive, not as applied; and the judge properly concluded that DALA did not have jurisdiction to hear Salisbury's claims.

We conclude by declining Salisbury's request that we reconsider the long-standing jurisdictional test outlined above. DALA, as this court has repeatedly held, is constituted to hear challenges to individual rate calculations, not to hear substantive attacks on the underlying regulations. See *Pharm. Ass'n, supra* at 139-140 (interpreting statute authorizing rate appeals to division of hearings officers and explaining reasons for distinction). Such substantive challenges are properly brought in the Superior Court as actions for a declaratory judgment under G. L. c. 30A, § 7, as indeed Salisbury did in this case. Salisbury offers no compelling reason for upsetting this framework.

require unusual equipment because of the unique nature of its services within the class, or because of the nature of its clientele; may traverse a territory with unusual geographic or transportation characteristics imposing a burden that other providers in the same class do not experience; or may cover an area where the population density differs greatly from that in areas covered by similar providers." *Rate Setting Comm'n* v. *Division of Hearings Officers*, 401 Mass. 542, 545-546 (1988) (*Hearings Officers*). We have also found to be "special circumstances" the costs resulting from a facility's " 'evolution from a community hospital to a tertiary care facility' " that were not "due to an industry-wide phenomenon." *Rate Setting Comm'n* v. *Baystate Med. Ctr.*, 422 Mass. 744, 749 (1996), quoting *Rate Setting Comm'n* v. *Baystate Med. Ctr.*, 30 Mass. App. Ct. 553, 557 (1991). All of these circumstances relate to a particular facility's rates and not to the substance of the rate setting regulation. "It is unnecessary to burden the Superior Court with these types of specialized issues." *Hearings Officers, supra* at 546.

[12]Because we find that Salisbury did not show "special circumstances," we need not proceed to the second prong of the jurisdictional test.

5. *Conclusion.* The judge correctly found that the application of the TPA did not subject Salisbury to an illegal base year, and that the rate setting regulations issued by DALA were not arbitrary, capricious, or contrary to law. She also correctly found that DALA lacked jurisdiction over Salisbury's substantive challenge to the regulations.

*Judgment affirmed.*