ARBELLA MUTUAL INSURANCE COMPANY & another[1] *vs.*
COMMISSIONER OF INSURANCE.

Suffolk. October 8, 2009. - February 16, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Commissioner of Insurance. Insurance,* Motor vehicle insurance, Assigned
risk. *Motor Vehicle,* Insurance. *Administrative Law,* Substantial evidence,
Time of decision, Rulemaking, Regulations, Emergency regulations,
Agency's interpretation of regulation.

The Commissioner of Insurance (commissioner) had authority under G. L.
c. 175, § 113H (A), to promulgate a rule delaying, by two years, the al-
location, to new entrants to the Massachusetts insurance markets (newly
writing companies), of automobile insurance policies issued to high-risk
drivers, where the delay did not unlawfully exempt the newly writing
companies from the Massachusetts Automobile Insurance Plan (MAIP)
(the system by which high-risk drivers in Massachusetts obtain private
automobile insurance coverage), and constituted a fair and equitable ap-
portionment among the insurance companies subject to MAIP [72-77];
further, in promulgating this rule, the commissioner did not act arbitrarily
or capriciously [77-80], and she did not fail to follow the appropriate
notice procedures [80-81].

An insurance company (plaintiff) lacked standing to challenge, as violative of
G. L. c. 175, § 113H (D), fifth par., the promulgation by the Commis-
sioner of Insurance of a rule governing limited assignment distribution
agreements, i.e, contracts between automobile insurance companies by
which, pursuant to the Massachusetts Automobile Insurance Plan (MAIP)
(the system by which high-risk drivers in Massachusetts obtain private
automobile insurance coverage), one insurer assigns to another insurer all
its current and future assignments of policies issued to such drivers, where
the plaintiff's interests did not come within the zone of interests arguably
protected by G. L. c. 175, § 113H (D), fifth par., which requires an insurer
to charge its high-risk policy holders under MAIP the same rate it would
have charged in the voluntary insurance market; where consumers were
not without recourse if the plaintiff could not stand in their shoes; and
where the plaintiff alleged only speculative harm. [81-84]

Discussion of the role of independent insurance agents in the voluntary and
residual automobile insurance markets. [84-87]

In promulgating a rule regulating the payment of insurance commissions to
independent insurance agents after an insurer decides to renew voluntarily
an automobile insurance policy originally issued to a high-risk driver under

---

[1]Massachusetts Association of Insurance Agents (MAIA).

the Massachusetts Automobile Insurance Plan (MAIP) (the system by which such drivers in Massachusetts obtain private automobile insurance coverage), the Commissioner of Insurance did not unlawfully circumvent the statutory rights of such agents, either under G. L. c. 175, § 162F, which governs such agents' ownership and exclusive right, outside the MAIP system, to use insurance policy data to solicit voluntary renewals [87-92], or under G. L. c. 175, § 113I, which does not require the continuation of commission payments to such agents for policies that have been removed from MAIP [92-93].

CIVIL ACTION commenced in the Superior Court Department on June 5, 2008.

The case was reported by *Margaret R. Hinkle*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Roberta R. Fitzpatrick* (*Laurence A. Schoen* with her) for Arbella Mutual Insurance Company.

*Dean Richlin* (*Pat A. Cerundolo* with him) for Massachusetts Association of Insurance Agents.

*Thomas A. Barnico*, Assistant Attorney General (*Elisabeth Ann Ditomassi* with him) for Commissioner of Insurance.

*Peter S. Rice & Robert M. Shaw*, for Safety Insurance Company, amicus curiae, submitted a brief.

CORDY, J. Pursuant to G. L. c. 175, § 113H (E), plaintiffs Arbella Mutual Insurance Company (Arbella) and Massachusetts Association of Insurance Agents[2] (MAIA) challenge several rules promulgated by the Commissioner of Insurance (commissioner). The rules relate to the administration of the Massachusetts Automobile Insurance Plan (MAIP), the system by which high-risk drivers in Massachusetts obtain private automobile insurance policies. The parties filed cross motions for judgment on the pleadings and on the administrative record, and a judge in the Superior Court reported the case without decision. We granted the plaintiffs' application for direct appellate review. We now uphold the decision of the commissioner to promulgate MAIP Rule 30.A (Count I), regulating the allocation of policies issued to high-risk drivers to newly writing companies; MAIP Rule 36

---

[2]MAIA is a trade association with a membership of approximately 1,600 licensed independent insurance agencies in Massachusetts. The parties stipulated that MAIA alleged sufficient facts to establish associational standing to bring this action on behalf of its individual members.

(Count II), regulating the assignment of policies issued to high-risk drivers by one insurer to another; and MAIP Rule 30.C (Count III), regulating the payment of insurance commissions to independent insurance agents after an insurer chooses to insure a high-risk driver outside MAIP.[3]

1. *Background.*[4] Massachusetts requires all drivers to obtain automobile insurance. G. L. c. 90, § 34J. However, some drivers are unable to do so in the voluntary market because insurers view them as a high risk. Thus, Massachusetts law requires the commissioner and a governing committee made up of insurance industry representatives (CAR governing committee) to promulgate and administer a system through which high-risk drivers can obtain insurance. See G. L. c. 175, § 113H. See also *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 479 (2006) (*Commerce*). The market for such policies is variously described as "residual," "involuntary," or "high-risk," and we use the phrases interchangeably. An insurance policy assigned for coverage through this market is called an "assigned risk policy."

Statutory law requires the creation of a residual market system, but it does not specify the exact form that it must take. See G. L. c. 175, § 113H; *Commerce, supra* at 482. One of the central features of any such plan is how the losses arising from policies issued to high-risk drivers are shared among insurers. Beginning in 1973, Massachusetts operated under a "reinsurance pool" in which insurers agreed to write policies for high-risk drivers on request, but would then cede the premiums, losses, and expenses generated by that risk to a central pool. This was known as the Massachusetts Motor Vehicle Reinsurance Facility. See CAR Reform: Shaping the Residual Market for the 1990's, at 19 (Sept.

---

[3]We acknowledge the amicus brief submitted by the Safety Insurance Company.

[4]We draw the facts in this case from the amended complaint, the administrative record filed as the answer, and the exhibits filed with the motions for judgment on the pleadings. Agreement over the facts contained therein predicated the report of this case pursuant to Mass. R. Civ. P. 64, as amended, 423 Mass. 1410 (1996), and G. L. c. 231, § 111. We also rely on a history of the Massachusetts residual insurance market prepared by predecessor of the Commissioner of Insurance (commissioner) in 1989. See CAR Reform: Shaping the Residual Market for the 1990's (Sept. 1989). That history was familiar to the commissioner and to Arbella Mutual Insurance Company (Arbella) during the hearings at issue in this case, and both cite the report in their appellate briefs.

1989). Losses arising from the pool were shared among all insurers based on their respective share of the voluntary private automobile insurance market. See *id.* See also *Commerce, supra* at 482, 485. In 1983, the Legislature amended the underlying statute, G. L. c. 175, § 113H, to give more flexibility to the commissioner and the CAR governing committee in designing the residual market system. See St. 1983, c. 241, § 17. See *Commerce, supra* at 485-486. That led to the creation of a new reinsurance facility, the Commonwealth Automobile Reinsurers (CAR). See *Commerce, supra* at 482. Under CAR, insurers continued to cede to a central pool the premiums, losses, and expenses from policies issued to high-risk drivers. *Id.*

In 2004, the commissioner approved a major overhaul to this system, ordering a transition from a reinsurance pool to an "assigned risk plan."[5] *Id.* at 479. Under an assigned risk plan, an insurer is assigned policies issued to high-risk drivers in proportion to the insurer's voluntary market share. The insurer assigned to service such a policy must absorb the losses from that policy itself; there is no central pool to which to cede the policy. *Id.* at 482. The assigned risk plan adopted by the commissioner is known as MAIP.[6]

We upheld the commissioner's authority to transition to MAIP in the *Commerce* case, after several insurance companies, including Arbella, contested her decision. The present controversy concerns several of the rules adopted to facilitate the operation of MAIP.[7]

---

[5]The transition from the Commonwealth Automobile Reinsurers (CAR) to the assigned risk plan was not instantaneous. The commissioner initially promulgated the Massachusetts Automobile Insurance Plan (MAIP) on December 31, 2004, but the final transition to MAIP was not scheduled to take place until April 1, 2008. MAIP is currently in operation.

[6]The terminology here can be confusing. Although the reinsurance facility known as CAR was replaced by the assigned risk plan known as MAIP, the governing committee responsible for effecting that transition, the CAR governing committee, remained unchanged. Moreover, while it is now responsible for proposing rules to govern MAIP, the CAR governing committee continues to function according to the requirements of the CAR Plan of Operation, the CAR governing committee's charter. The resulting rules that govern MAIP are known as the MAIP Rules of Operation. Likewise, the rules that governed CAR prior to its replacement were known as the CAR Rules of Operation.

[7]Article X of the CAR Plan of Operation governs the rule making procedure. Under that provision, the CAR governing committee prepares and submits

a. *Challenge by MAIA to MAIP Rule 30.C.* On September 19, 2007, the CAR governing committee voted to amend MAIP Rule 30.C. That rule establishes a process by which an insurer may opt to insure an assigned risk on a voluntary basis by moving it from its involuntary MAIP portfolio to its voluntary portfolio. The CAR governing committee's proposed amendment to the rule would have required insurers who opt to insure an assigned risk voluntarily to continue to pay a commission to the agent who submitted the application to MAIP. On October 19, 2007, the commissioner disapproved the proposed amendment and scheduled a hearing regarding her decision. On January 2, 2008, after the hearing, the commissioner issued a decision and order regarding the amendment, essentially adopting it with a "sunset" date of April 1, 2011, at which time insurers would no longer have to pay commissions on assigned risks they opt to insure voluntarily.

MAIA challenges MAIP Rule 30.C, as adopted by the commissioner, on the grounds that it violates two statutory provisions. First, MAIA objects to the rule insofar as it terminates in 2011 an insurer's obligation to pay a commission to the agent designated by the policyholder as the policyholder's representative. MAIA argues that G. L. c. 175, § 113I, requires that a commission continue to be paid. Second, MAIA contends that the rule violates G. L. c. 175, § 162F, because it allows insurers to use insurance policy data to solicit voluntary renewals. MAIA asserts that § 162F vests ownership and an exclusive right to use that information in agents, not insurers.

b. *Challenge by Arbella to MAIP Rules 30.A and 36.* On November 15, 2007, the CAR governing committee voted to amend MAIP Rule 22 and MAIP Rule 29 to add a definition of a "newly writing company," that is, a new entrant to the Massachusetts insurance market. The amendments would have caused such companies to begin receiving assigned risks immediately on their entry into the insurance market. The CAR governing committee submitted the proposed amendments to the commis-

proposed rules for the commissioner's approval. However, the commissioner is not required to approve proposed rules and may promulgate rules in their place if she deems it necessary and efficient to do so. Moreover, if the commissioner finds that immediate adoption of a rule is required, she may promulgate it as an emergency rule, which may remain in effect up to ninety days.

sioner for approval on January 31, 2008. In response, on February 6, 2008, the commissioner disapproved the proposed amendments and, pursuant to her authority under Article X of the CAR Plan of Operation, promulgated emergency rules to amend MAIP Rules 21 through 24, and MAIP Rules 26 through 38. A hearing was held on April 10, 2008, and on May 6, 2008, the commissioner approved and adopted those rules.[8]

Arbella challenges MAIP Rule 30.A, which delays the allocation of assigned risks to newly writing companies for a period of two years after their entry into the Massachusetts insurance market. Arbella argues that the commissioner exceeded her authority under G. L. c. 175, § 113H (A), by establishing a residual market system that does not include newly writing companies for two years. Alternatively, Arbella argues that even if MAIP Rule 30.A does not offend the substantive provisions of G. L. c. 175, § 113H (A), the rule should still be invalidated because the commissioner's decision promulgating it was arbitrary and capricious. Finally, Arbella contends that the commissioner did not follow the proper procedure when she disapproved the CAR governing committee's proposed amendments to MAIP Rule 22 and MAIP Rule 29 and, thus, that the proposed amendments effectively were promulgated.

Arbella also challenges MAIP Rule 36, which regulates agreements between insurers known as limited assignment distribution agreements (LADAs). A LADA is an agreement by which one insurer assigns for servicing all of its assigned risk policies under MAIP to another insurer for a fee. Arbella argues that MAIP Rule 36 harms consumers because high-risk drivers whose policies are assigned under a LADA will face higher rates from the assignee insurer than they would from the assignor insurer. This harm, Arbella asserts, is in direct violation of G. L. c. 175, § 113H (D), fifth par. (the so-called Lane-Bolling Amendment).[9] Arbella also complains that large insurers such as itself are treated differently from smaller insurers.

---

[8]In response to testimony at the hearing, the commissioner made some changes to the emergency rules. However, those changes have no impact on Arbella's and MAIA's challenges.

[9]Hereinafter, we shall refer to the Lane-Bolling Amendment by its name, not by its codification in the General Laws.

2. *Discussion.* Any ruling, order, or decision of the commissioner is subject to review pursuant to G. L. c. 175, § 113H. See G. L. c. 175, § 113H (E), eleventh par.; *Trust Ins. Co.* v. *Commissioner of Ins. (No. 1)*, 48 Mass. App. Ct. 617, 625 (2000). We begin by considering Arbella's challenge to MAIP Rule 30.A, including whether the commissioner provided adequate notice when she disapproved rules proposed by the CAR governing committee. We then turn to MAIP Rule 36. Finally, we consider MAIA's challenge to MAIP Rule 30.C.

a. *MAIP Rule 30.A: allocation of assigned risks to newly writing companies.* i. *The commissioner's authority under G. L. c. 175, § 113H.* It is undisputed that under MAIP Rule 30.A, as promulgated by the commissioner, newly writing companies are not assigned to service policies issued to high-risk drivers until such companies have been active in the Massachusetts private automobile insurance market for two years. Consequently, newly writing companies will not share in any losses from such policies during that period. Arbella's primary argument is that this result exceeds the authority found in G. L. c. 175, § 113H (A):

> "Insurance companies undertaking to issue motor vehicle liability policies or bonds, both as defined in section thirty-four A of chapter ninety, shall cooperate in the preparation and submission of a plan which shall provide motor vehicle insurance to applicants who have been unable to obtain insurance through the method by which insurance is voluntarily made available . . . . *Such a plan shall provide for the fair and equitable apportionment among such insurance companies of premiums, losses or expenses, or any combination thereof*" (emphasis added).

The validity of MAIP Rule 30.A is a question of statutory interpretation, which we consider de novo. See *Commerce*, *supra* at 481. In doing so, we are mindful that a statute's language should be read in accord with the statute's purpose and history, see *id.*, but we are deferential to the commissioner's interpretation so long as it is "reasonably related to the objective of, or within the ambit of, its enabling statute." *Id.* at 483, citing *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977). Arguments that a different choice by the com-

missioner would have been preferable or more efficient will not undermine a choice that was authorized by the statute. See *Commerce, supra* at 483. The burden rests with Arbella to establish that the rule exceeded the statute's authorization. See *id.* at 481, citing *Massachusetts State Pharmaceutical Ass'n* v. *Rate Setting Comm'n*, 387 Mass. 122, 126 (1982).

Both Arbella and the commissioner agree that all companies issuing private automobile insurance policies in Massachusetts, including newly writing companies, are subject to the plan chosen to regulate the residual market — here, MAIP. The issue, then, is whether the two-year delay before a newly writing company is assigned any policies issued to high-risk drivers (and therefore any losses) either unlawfully exempts such companies from MAIP, or is not a "fair and equitable apportionment among" the companies subject to MAIP. G. L. c. 175, § 113H (A).

Arbella's argument that newly writing companies are unlawfully exempted from MAIP finds little traction because newly writing companies do, in fact, participate in MAIP from the time they begin writing insurance policies in Massachusetts. MAIP Rule 23 requires all companies subject to MAIP, which includes newly writing companies, to pay assessments levied against them for the operating expenses of MAIP. MAIP Rule 35 assesses such expenses to each company based on its share of the voluntary market, calculated quarterly. Although newly writing companies are not assigned policies issued to high-risk drivers and therefore do not collect insurance premiums or incur losses related to such policies, they do contribute to the administrative cost of MAIP through these assessments. Thus, they are not completely exempted from MAIP.[10]

We turn, then, to whether the two-year delay is a "fair and

---

[10]This conclusion is not inconsistent with the precedent cited by Arbella for the proposition that "all" insurers must participate in the residual market system. See, e.g., *Hartford Acc. & Indem. Co.* v. *Commissioner of Ins.*, 407 Mass. 23, 24 (1990) ("All motor vehicle insurers in Massachusetts are required to participate in the [residual market] plan"); *Reliance Ins. Co.* v. *Commissioner of Ins.*, 31 Mass. App. Ct. 581, 584 (1991) (plan "allocates responsibility among all Massachusetts automobile insurers for the expenses and losses incurred on policies provided to drivers who would otherwise be unable to obtain insurance"). As we have established, all companies do participate in the residual market system.

equitable apportionment . . . of premiums, losses or expenses, or any combination thereof." G. L. c. 175, § 113H (A). The language of the statute is not definitive. As we noted in *Commerce, supra* at 483, "§ 113H (A) does not specify how the apportionment must take place." What is clear is that none of the terms used in the statute — "fair," "equitable," and "apportionment" — requires mathematical precision.[11] Additionally, the phrase "any combination thereof" supports interpreting the statute as a broad grant of flexibility to establish apportionment formulas.

MAIP apportions to a newly writing company a percentage of MAIP *expenses* based on its voluntary market share, and zero per cent of MAIP *losses* or *premiums* for two years. This represents one possible combination of expenses, losses, and premiums: some, none, and none. Arbella bears the burden of establishing that this combination falls outside the objective or ambit of the statute. See *id.* at 481. It has not done so. Although Arbella offers evidence that newly writing companies have never enjoyed this particular combination of expenses, losses, and premiums, we agree with the commissioner: the same evidence supports taking a broad view of how the residual market plan mandated by § 113H (A) may be structured. Moreover, Arbella has not established that the regulatory scheme resulting from MAIP Rule 30.A will lead to a residual market plan that contradicts the objectives of the statute.

Flexibility has always been central to the method for apportioning among insurance companies losses from policies issued to high-risk drivers. For example, according to an official report prepared by the then-commissioner, during the 1980's the allocation formula of the residual market was updated several times. See CAR Reform: Shaping the Residual Market for the 1990's, at 23-33 (Sept. 1989).[12] During that time, CAR Rule 11 regulated each participating company's share of CAR premiums, losses,

---

[11]"To apportion is to divide and assign in just proportion, to distribute among two or more a just part or share to each, albeit, a division may be just without necessarily being also an exactly equal division" (quotation and citation omitted). *Manhattan Gen. Equip. Co.* v. *Commissioner of Internal Revenue*, 297 U.S. 129, 134 (1936).

[12]We focus on the commissioner's discussion of the 1980's because G. L. c. 175, § 113H (A), was amended in 1983 to its current form. See St. 1983, c. 241, § 17. See also *Commerce Ins. Co.* v. *Commissioner of Ins.*, 447 Mass. 478, 485-486 (2006) (*Commerce*).

and expenses. See *id.* at 29-33. The specific allocation formula changed over time — itself indicative of flexibility — but always included two elements. First, the formula prevented a company's allocation from increasing or decreasing more than a set percentage in any given year. See *id.* Thus, if one company vastly decreased its market share, its share of CAR losses could decrease only by a certain amount. This protected other companies from suddenly shouldering a large influx of new CAR losses, even though their actual market shares would have required them to do so. As the commissioner explained in 1989, see *id.* at 29, this system was designed to implement the language of G. L. c. 175, § 113H (D), second par., which states that the allocation formula "shall be based on a method so that no company materially or substantially reduces its percentage of participation by reducing its writings, nor shall any company have their participation materially or substantially increased because of the actions of other companies." Thus, the formula did not allocate losses by market share alone because it could not.[13]

The second feature of the apportionment formula under CAR was that CAR Rule 11 treated "newly-emerging and newly-writing companies" differently from established insurers. See CAR Reform: Shaping the Residual Market for the 1990's, *supra* at 32. Such companies were "subject to a special formula for five years" which set allocation levels initially at twenty per cent of their voluntary market share, increasing by twenty per cent each year. *Id.* Thus, while a newly writing company did contribute against CAR losses, its contribution was capped at eighty per cent below its actual market share for its first year of business.

Arbella interprets this history as evidence that the current two-year delay is not permissible under the statute. For example, it highlights a statement in the commissioner's 1989 report that losses from the CAR plan are "spread over every auto insurance policy in the state, and [are] intended to be made up by

---

[13]Arbella contends that the new allocation formula established by MAIP Rule 30.A will cause current MAIP participants such as itself to have their participation increased beyond their market share. However, this objection cannot be reconciled with the history recounted above: G. L. c. 175, § 113H (D), second par., has never prevented another company's participation from changing as a result of another company's actions, such as entry into the Massachusetts market. The statute is violated only if that change is substantial.

profit margins on voluntary policies." *Id.* at 4. See also *id.* at 28. Were it not for the fact that the commissioner's words came in the context of describing the allocation system discussed above, this statement might be taken to mean that a residual market system is only workable if every company pays its mathematically proportionate share of losses. Plainly, that is not how the system worked.

The best evidence in support of Arbella's position is that newly writing companies have never been allocated zero per cent of the losses arising from the residual market plan. In essence, Arbella asks us to conclude that although it was permissible to allocate less than one hundred per cent of a company's share of CAR losses for four years (CAR Rule 11), it is impermissible to allocate them zero per cent for two years followed thereafter by an allocation of one hundred per cent (MAIP Rule 30.A). We cannot: neither the logic of the statutory language nor the history of flexible implementation of that language compels us to find that the commissioner's proposed change to the MAIP allocation rules exceeds the scope of G. L. c. 175, § 113H (A).

Finally, Arbella argues that competition among insurance companies will be so skewed by the two-year delay that the resulting market cannot be reasonably related to the objective of the statute, which we have described as "to provide insurance to high-risk drivers who are unable to obtain insurance in the voluntary market, and to apportion net losses fairly among carriers." *Commerce, supra* at 482. Arbella does not contend that the allocation formula promulgated by the commissioner will undermine the objective of providing high-risk drivers with insurance; rather, its argument is that the two-year delay is unfair and inequitable because it permits newly writing companies to poach less-risky policies without worrying about the costs associated with increased market share.

In light of our duty to "apply all rational presumptions in favor of the validity of the administrative action," *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977), Arbella's argument must fail. Arbella has not demonstrated that the allocation formula established by MAIP Rule 30.A unbalances competition between insurance companies any more than the former CAR Rule 11 did. Moreover, the commis-

sioner noted in her decision and order regarding MAIP Rule 30.A that newly writing companies face start-up costs when entering the Massachusetts market. In part because of these costs, the commissioner concluded that the two-year delay was a fair and equitable formula designed to encourage and facilitate new entry while still apportioning newly writing companies their market share of losses, premiums, and expenses within two years.[14] Arbella has not established that this formula defeats the objective of the statute. See *Commerce, supra* at 481.

Therefore, based on the text and history of G. L. c. 175, § 113H (A), we conclude that the commissioner had the authority to promulgate MAIP Rule 30.A.

ii. *Adequacy of the commissioner's decision.* In the alternative, Arbella contends that even if the commissioner had the statutory authority to promulgate MAIP Rule 30.A, her decision was nonetheless arbitrary and capricious because it was unsupported by the administrative record.

"The standard of review applicable in a review of regulations is well established, 'namely, whether the regulations are illegal, arbitrary, or capricious.' " *Salisbury Nursing & Rehabilitation Ctr.* v. *Division of Admin. Law Appeals,* 448 Mass. 365, 371 (2007), quoting *Beth Israel Hosp. Ass'n* v. *Rate Setting Comm'n,* 24 Mass. App. Ct. 495, 505 (1987). Again, Arbella bears the burden of showing the commissioner's decision was arbitrary or capricious. *Salisbury Nursing & Rehabilitation Ctr.* v. *Division of Admin. Law Appeals, supra.* This is a heavy burden that requires Arbella to "establish the 'absence of any conceivable ground' upon which the regulation may be upheld." *Id.* at 371-372, quoting *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.,* 436 Mass. 763, 771 (2002). Indeed, we indulge all rational presumptions in favor of validity; we will not declare the regulations void unless no reasonable construction of them is in harmony with the legislative mandate. See *Salisbury Nursing & Rehabilitation Ctr.* v. *Division of Admin. Law*

---

[14]The commissioner also noted that the two-year delay is balanced by the requirement that an insurance company that wishes to withdraw from the Massachusetts insurance market must continue to service its existing policies for three years after it ceases writing new business in the State. However, we find this rationale unpersuasive because it has no bearing on how policies are allocated to newly writing companies in the involuntary market.

*Appeals, supra* at 372, quoting *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ., supra.*

To show the "absence of any conceivable ground" to support the commissioner's decision, Arbella focuses its attention on a single sentence in the commissioner's order and decision regarding MAIP Rule 30.A: "This rule will establish a period of two years during which a new entrant will not receive an assignment from the MAIP, *a result which aligns with our historical practice in Massachusetts and with residual markets throughout the United States that are structured as assigned risk plans . . .*" (emphasis added). The sentence concludes, "as discussed more fully below," and is followed by the commissioner's review of the evidence placed before her during the April 10, 2008, hearing. Arbella's burden is to prove that the commissioner's stated rationales have no basis in the record. See *Salisbury Nursing & Rehabilitation Ctr.* v. *Division of Admin. Law Appeals, supra* at 371-372. Moreover, it must do so against the current of our deference in favor of validity. See *id.* at 372.

The commissioner's first justification for MAIP Rule 30.A is that it aligns with "historical practice in Massachusetts." We have already addressed "historical practice in Massachusetts" with regard to newly writing companies, *supra.* That history establishes that newly writing companies have never been apportioned zero losses in their first two years of operation in the State, but that they have received up to an eighty per cent deduction from their actual market share of losses during their first year of operation. This is sufficient basis on which to conclude that the new model is not so far removed from its precedents as to lack any conceivable ground. Contrary to Arbella's assertion, the record supports the commissioner's rationale. See *id.* at 371-373.

The commissioner's second justification for MAIP Rule 30.A is that a two-year delay for newly writing companies aligns with how other States structure their residual market plans. Arbella argues that this justification is unsupported by the record, and contends that the idiosyncrasies of the residual market system in Massachusetts make comparisons to other States' plans unhelpful. Arbella points out that insurers in other States are permitted to charge assigned risks higher rates than voluntary risks to compensate for their increased likelihood of causing losses.

However, in Massachusetts, the Lane-Bolling Amendment prohibits insurers from compensating in this manner, making the Massachusetts system unique.[15] Arbella also highlights how the Lane-Bolling Amendment interacts with insurance rate caps. Combined, Arbella contends these provisions could amplify the impact of the two-year delay by increasing the financial burden imposed on existing market participants.

Most of Arbella's position takes the form of policy argument. We do not second guess policy decisions. See *Salisbury Nursing & Rehabilitation Ctr.* v. *Division of Admin. Law Appeals*, *supra* at 373 ("The question here is not whether the [policy choice] is the best or most sensible way to control costs, but whether it bears a rational relationship to the agency's statutory authority and directive. . . . In reviewing a regulation, this court does not substitute its judgment concerning the wisdom of the regulation for that of the agency"). Thus, while we note that the commissioner addressed these policy concerns directly,[16] we confine our review to whether the commissioner's decision was based on the record. See *id.* at 372-373. In crediting evidence that other States grant newly writing companies a two-year delay before being assigned risks, the commissioner acknowledged that the evidence was not a perfect fit to Massachusetts. The commissioner noted that where other States delay assignments due at least in part to administrative lags in obtaining statistical data, Massachusetts faces no such lag.[17] The commissioner found that the new two-year delay in Massachusetts was "consistent" with this evidence, not that it was compelled by it.

Arbella has not established that the commissioner used

---

[15]We address the Lane-Bolling Amendment in some detail, *infra*.

[16]The commissioner found that any advantage newly writing companies might receive as a result of the two-year delay would be offset by their start-up costs, the fair competition requirement embodied in G. L. c. 175E, § 9, and the imprudence of exacting steep rate increases on customers once the two-year delay expires. Thus, the commissioner concluded that the arguments proffered by Arbella and other insurance companies overlooked significant portions of the record. We cannot find that this reasoned view was arbitrary or capricious.

[17]In Massachusetts, insurance companies are required to report their monthly premium data within forty-five days after the close of the month in which the business is written. See CAR Accounting and Statistical (A & S) Notice 493 (Feb. 6, 2009). Each month, CAR updates each company's market share based on this data and assignments are made accordingly.

evidence inappropriately, nor has it established that the commissioner should have been required to ignore nationwide practices because Massachusetts is unique.[18] The decision by the commissioner to adopt a two-year delay in MAIP assignments for newly writing companies was not arbitrary or capricious.

iii. *Notice requirements under G. L. c. 175, § 113H (E).* Finally, Arbella argues that the commissioner did not follow the appropriate procedures when she disapproved the rule proposed by the CAR governing committee, MAIP Rule 29, and replaced it with MAIP Rule 30.A. Arbella points to G. L. c. 175, § 113H (E), which requires the commissioner to "issue a notice specifying in what respects the amendments do not meet the requirements of [§ 113H]" before disapproving "[a]mendments to such a plan." See G. L. c. 175, § 113H (E), third par. Arbella's argument is that the commissioner did not specify what was wrong with the proposed rules.[19] We disagree.

The commissioner conveyed her disapproval in a February 6, 2008, letter. Arbella is correct insofar as the commissioner did not follow her disapproval with any explicit explanatory statement. However, in addition to disapproving the proposed changes to MAIP Rule 22 and MAIP Rule 29, the commissioner announced that she was promulgating amendments to those rules and several others because she found that emergency promulgation was required to insure the fair and equitable operation of the residual market. Attached to the letter was a copy of the emer-

---

[18]The data regarding other States' assignment delays was submitted by Property Casualty Insurance Association, which opposed the rule change. Further, it is not clear that Arbella's distinction between other States' administrative lag and Massachusetts's two-year delay supports its point. As described by Arbella, the administrative lag requires other States to assign risks based on market share data that is two years old. Thus, all companies are assigned risks according to their market shares from two years before, including newly writing companies whose market share at entry could be effectively zero. This is the interpretation to which we are led by Arbella's argument, although we note that neither party has fully explained how other States actually apportion assigned risks.

[19]The commissioner argues that the CAR governing committee's proposed changes to MAIP Rule 22 and MAIP Rule 29 were not "amendments" within the meaning of G. L. c. 175, § 113H (E), and therefore that the commissioner was not bound by the procedural requirements embodied in that section. Because we hold against Arbella on other grounds, there is no need for us to reach this issue.

gency rules and a notice of a hearing regarding them. Thus, the full context of the commissioner's decision reveals ample explanation of her rationale: the proposed rules did not meet the requirements of § 113H because the emergency rules promulgated in their place were necessary for the fair and equitable operation of the residual market.

b. *MAIP Rule 36: limited assignment distribution agreements.* The commissioner also promulgated a change to MAIP Rule 36, which governs LADAs. LADAs are contracts between insurers by which one insurer assigns all its current and future high-risk assignments to another insurer, called an assigned risk company (ARC). MAIP Rule 36 sets out several required terms for LADAs. It also limits which insurers may assign their risks without the commissioner's approval and which insurers may serve as ARCs. These rules are designed with the consumer in mind. Because the drivers who require assigned risk policies tend to be less experienced or to have bad driving records, these policies often require a disproportionate degree of administrative attention from the companies that service them. Companies with small MAIP quotas, i.e., those with small voluntary market shares, may be less well-equipped to give MAIP policyholders the attention they need and deserve. Thus, MAIP Rule 36 permits companies with a market share of five per cent or less to enter LADAs without first seeking the commissioner's permission because the consumer is likely to benefit from the service provided by a better-equipped ARC. Similarly, MAIP Rule 36 requires an insurer to service at least one per cent of the voluntary market to serve as an ARC, assuring it will have the necessary resources to manage high-risk policies.

The requirement that ARCs have a minimum market share serves another important end. The minimum market share indicates a degree of success in the voluntary market that implies that ARCs will have a competitive voluntary market rate. This latter benefit is relevant here because the Lane-Bolling Amendment requires an insurer to charge its high-risk policyholders the same rate it would have charged in the voluntary market. The commissioner explained that the minimum market share requirement is designed to ensure that high-risk policyholders are assigned to ARCs that have competitive voluntary rates.

Arbella argues that we should vacate MAIP Rule 36. Arbella's

objection to the rule is that it conflicts with the Lane-Bolling Amendment by subjecting MAIP policyholders to the prospect of paying higher rates to ARCs that take over their policies than they would have paid to the company originally assigned their policies. Arbella also asserts that its market share, which is greater than five per cent, does not permit it to enter LADAs without the commissioner's permission. The latter is Arbella's chief complaint: it would prefer LADA regulations that give it a freer hand and that treat all insurance companies alike.[20] As a threshold matter, we hold that Arbella lacks standing.

"[T]o establish standing to challenge administrative agency actions, a plaintiff must allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred. . . . That is, to have standing here the plaintiff['s] interests must come within the zone of interests arguably protected by" the Lane-Bolling Amendment (quotations and citations omitted). *Indeck Me. Energy, LLC* v. *Commissioner of Energy Resources*, 454 Mass. 511, 517 (2009). Moreover, "[i]njuries that are speculative, remote, and indirect are insufficient to confer standing." *Ginther* v. *Commissioner of Ins.*, 427 Mass. 319, 323 (1998). Arbella's complaint falls short on both fronts.[21]

We begin by considering the "zone of interests" protected by the Lane-Bolling Amendment. We have surveyed the law's legislative history and discovered nothing that would indicate that the Lane-Bolling Amendment was intended to protect insurance companies. Additionally, logic does not support an inference that a cap on rates operates to the protection of companies that might prefer to charge a higher rate. Indeed, in the context of its argument regarding MAIP Rule 30.A, Arbella highlighted how the

---

[20]The benefit of arguing that MAIP Rule 36 is inconsistent with the Lane-Bolling Amendment is that we review interpretations of law de novo, see *Commerce, supra* at 481; but, we are highly deferential to policy decisions by administrative officials. See *Attorney Gen.* v. *Commissioner of Ins.*, 442 Mass. 793, 795-796 (2004).

[21]A party may also obtain standing in a representative capacity. See *Slama* v. *Attorney Gen.*, 384 Mass. 620, 624 (1981). However, Arbella has failed to argue that it should be permitted to represent the interests of consumers potentially harmed by a violation of the Lane-Bolling Amendment, let alone put forth evidence that it would be "difficult or impossible for the actual rightholders to assert their claims." *Id.*

Lane-Bolling Amendment makes the Massachusetts residual insurance market unique: in other States, insurers are permitted to charge higher rates to compensate for taking on involuntary risks. In Massachusetts, the Lane-Bolling Amendment makes that practice unlawful; insurers are forced to charge lower premiums than they might otherwise.

Therefore, the Lane-Bolling Amendment protects consumers, not insurance companies. Arbella attempts to sidestep this fact by arguing that it will be harmed if smaller insurance companies are permitted to circumvent the Lane-Bolling Amendment by assigning away their policies issued to high-risk drivers. However, even were we persuaded that Arbella's predictions were accurate, we cannot conflate this alleged harm with the interests protected by the statute. See *Circle Lounge & Grille, Inc.* v. *Board of Appeal of Boston*, 324 Mass. 427, 429-430 (1949) (purpose of zoning regulations was not to protect businesses from competition). That MAIP Rule 36 may confer a moderate advantage on smaller insurance companies compared to large entities like Arbella is a harm to competition, which is not sufficient to confer standing. See *Indeck Me. Energy, LLC* v. *Commissioner of Energy Resources*, *supra* at 517, citing *Circle Lounge & Grille, Inc.* v. *Board of Appeal of Boston*, *supra* at 429.[22] The unlevel playing field Arbella criticizes is not within the zone of interests protected by the Lane-Bolling Amendment.

Arbella also cannot assert standing to protect the interests of consumers who might face higher rates as a result of MAIP Rule 36. See *Town Taxi, Inc.* v. *Police Comm'r of Boston*, 377 Mass. 576, 581 (1979) (taxicab companies lacked standing to challenge discriminatory impact of taxicab rates on different classes of passengers). Consumers are not without recourse if Arbella cannot stand in their shoes. See *Tax Equity Alliance* v. *Commissioner of Revenue*, 423 Mass. 708, 716 (1996) ("an unfounded assumption that, if the individual plaintiffs lack standing,

[22]Although there is an exception to this rule for competitors in a regulated industry, see *Indeck Me. Energy, LLC* v. *Commissioner of Energy Resources*, 454 Mass. 511, 517 (2009), Arbella has not argued that it is entitled to rely on this exception. Regardless, as our discussion of MAIP Rule 36 demonstrates, it is doubtful that Arbella could meet its burden of showing that "the type of injury alleged is inconsistent with the aims and purposes of the entire regulatory scheme." *Id.*

no one will have standing to sue, is not a reason to find standing where none exists").

Moreover, Arbella has alleged only speculative harm. See *Ginther* v. *Commissioner of Ins., supra* at 323. Thus, even were Massachusetts to recognize a form of representational standing by which Arbella could assert the interests of consumers, relief would be inappropriate at this time. Arbella argues that consumers will almost certainly face higher prices from ARCs than the insurers to which they are originally allocated. This argument rests on a theory that MAIP Rule 36 creates an economic incentive for insurers to enter LADAs with ARCs who charge the highest voluntary rates. That is, the greater the difference between the original insurer's voluntary rate and the ARC's voluntary rate, the less the original insurer will have to pay the ARC for taking on the assigned risk policies. The commissioner replies that the minimum market share requirement necessary to qualify as an ARC means that ARCs will have competitive voluntary rates, thereby ameliorating or eliminating the opportunity to indulge this incentive. We agree with the commissioner. " '[I]mplications' are hardly appealable," especially when they are as "chimerical" as those alleged by Arbella. See *Group Ins. Comm'n* v. *Labor Relations Comm'n*, 381 Mass. 199, 205 (1980).[23]

c. *MAIP Rule 30.C: the removal of policies from MAIP.* We turn now to MAIA's challenge to MAIP Rule 30.C. The rule establishes a "take out" procedure by which an insurer may offer to renew voluntarily a policy that it has been assigned under MAIP. MAIA, which represents the interests of independent insurance agents in Massachusetts, objects that the take out procedure unlawfully enables insurers to circumvent agents who have submitted applications for insurance under MAIP on behalf of drivers who were unable to find insurance in the voluntary market. Specifically, MAIA argues that MAIP Rule 30.C contravenes G. L. c. 175, § 113I, because, after April 1, 2011, the rule absolves insurers from any obligation to pay these agents commissions for voluntarily renewed policies. MAIA also argues that

---

[23]Our conclusion is bolstered by the fact that Arbella relies on evidence proffered to the commissioner to show how MAIP Rule 36 would give smaller insurers a leg up against larger ones. Arbella does not contend that LADAs are bad for consumers, only that it should be allowed to enter LADAs in the same manner as its smaller competitors.

the rule impermissibly authorizes insurers to solicit these renewals by exploiting important insurance policy data, known as insurance expirations, that belongs exclusively to the agents pursuant to G. L. c. 175, § 162F. For her part, the commissioner argues that neither of these statutes is implicated by the take out procedure.[24]

i. *The role of independent agents in the voluntary and residual insurance markets.* We begin our discussion with a brief overview of the role that independent insurance agents play in the Massachusetts automobile insurance industry. Outside the residual market for insurance policies created by MAIP, insurer-agent relationships are governed by contract. Our focus in this case is on independent insurance agents, who may solicit business for multiple insurers.[25] When a driver approaches an independent agent, the agent may submit applications to each of the several insurers with which the agent has an agency contract.[26] If the driver's application is accepted by one of those insurers, and the driver pays the insurer's required premium, then the agent is entitled to a commission under the terms of the agent's contract with the insurer.[27]

---

[24]The commissioner also argues that MAIA has not presented a justiciable "actual controversy" because the complained of effects of MAIP Rule 30.C are not scheduled to take effect until April 1, 2011. We disagree. "In the sense that the matter at issue here involves a dispute over an official interpretation of a statute and the validity of a regulation promulgated pursuant to that interpretation, a justiciable controversy exists." *Massachusetts Ass'n of Indep. Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 293 (1977). By addressing these issues today, we comply with the purpose of G. L. c. 231A, "which is to enable a court 'to afford relief from . . . uncertainty and insecurity with respect to rights, duties, status and other legal relations.' " *Massachusetts Ass'n of Indep. Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, *supra* at 292, quoting G. L. c. 231A, § 9.

[25]In other cases, an agent may be bound to a single insurance carrier, such as when the agent is an employee of an insurer or has an exclusive contract with one insurer. Under these arrangements, when a driver approaches the agent to obtain coverage, the agent submits the driver's application to a single insurer. See *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 418 & n.2 (1986); 13 E.M. Holmes, Appleman on Insurance § 95.1, at 474 (2d ed. 2003).

[26]In Massachusetts, over eighty per cent of consumers seek automobile insurance through independent insurance agents.

[27]Although payment of the agent's commission is required by statute, see G. L. c. 175, § 162D, the exact terms of the agent's remuneration will be set forth in the agent's contract with the insurer. See 13 E.M. Holmes, Appleman on Insurance, *supra.*

If an agent is unable to procure insurance for a driver because the driver is a risk too high to insure profitably, the driver may be eligible to obtain insurance in the residual market. G. L. c. 175, § 113H (A), first par. If so, the agent will file an application to insure the driver through MAIP. The application then is assigned *randomly* to an insurer participating in MAIP, and the insurer receiving the assignment is required to service the policy for three years.

The insurer randomly assigned to service such a policy is nevertheless required to pay a commission to the agent submitting the driver's application to MAIP. General Laws c. 175, § 113I, states that, "pursuant to the plan approved under [§ 113H]," insurers must pay submitting agents a "fair and reasonable commission."[28] Similarly, G. L. c. 175, § 113H (D), first par., requires that, for policies "insured through" the residual market, agents must receive "the average percentage commission" paid by the insurer to agents submitting policies in the voluntary market.[29] We interpret these sections to mean that the commission formula set by § 113H (D) is "fair and reasonable," and thus is in harmony with § 113I.[30] Consistent with this interpretation, MAIP Rule 37, which sets commissions to

[28]General Laws c. 175, § 113I, provides, in pertinent part:

> "Nothing in this chapter shall be construed to abridge or restrict the freedom of contract between insurers and agents or brokers nor to require an insurer to issue policies in any way other than through its ordinary and usual method of marketing except that insurers shall, pursuant to the plan approved under [§ 113H], be required to recognize and to permit immediate certification of insurance by and to pay a fair and reasonable commission to any licensed broker or agent designated as the producers of record by applicants for insurance or renewal thereof."

MAIP is the "plan approved under [§ 113H]."

[29]General Laws c. 175, § 113H (D), first par., provides:

> "The plan shall provide for the payment of a commission to independent insurance agents or brokers on business insured through the plan which shall be stated in the filing of rates as a percentage equal to the average percentage commission paid for risks not insured through the plan to agents by companies which do business through independent insurance agents pursuant to the so-called American Agency System."

[30]General Laws c. 175, § 113I, was originally enacted in 1954, St. 1954,

be paid on policies insured through MAIP, mirrors the language in § 113H (D).

The random assignment of drivers to insurers under MAIP has an important consequence: agents submitting applications to MAIP will often be paired with insurers with whom they have no contractual relationship. Thus, in the context of insurance issued through MAIP, the terms of the agent-insurer relationship are governed not by contract but by statute and regulation. The parties' respective obligations to each other are limited to those established by the Legislature and the commissioner.

ii. *MAIA's challenge to MAIP Rule 30.C, the "take out" procedure.* We turn now to MAIP Rule 30.C. When a driver's policy issued through MAIP is set to expire, the rule permits the insurer servicing the policy to renew it on a voluntary basis, that is, outside of MAIP. This "take out" procedure functions as follows. Ninety days prior to expiration of such a policy, the insurer must notify the driver's agent of its intent to offer the driver voluntary coverage. For the next forty-five days, the agent is permitted to seek alternate coverage for the driver, presumably through insurers with whom the agent has an ongoing contractual relationship. If the agent is unable to procure alternate coverage within this forty-five day window, the insurer is authorized to offer the voluntary renewal directly to the driver and, provided the driver accepts the voluntary renewal, the driver and insurer may enter into a contractual agreement that does not include the agent. Despite the fact that the agent is not a party to the insurance contract, however, MAIP Rule 30.C requires the insurer to continue paying the agent a commission on the voluntary policy until April 1, 2011. After that date, insurers are relieved of this obligation, and agents will receive no further compensation for policies removed from MAIP.

MAIA argues that MAIP Rule 30.C unlawfully circumvents the statutory rights of the agents in two ways. First, it argues that, pursuant to G. L. c. 175, § 162F, agents have an exclusive

c. 274, and amended to reflect its current form in 1973. St. 1973, c. 551, § 6. The language in G. L. c. 175, § 113H (D), was initially inserted by the Legislature later, in 1976. St. 1976, c. 266, § 16. Its language has changed slightly since that time to reflect the Commonwealth's transition away from a mandated reinsurance facility. See St. 1983, c. 241, § 17. See also *Commerce*, *supra* at 485-486. The language was formally codified as § 113H (D) in 1983. St. 1983, c. 241, § 17.

right to use information concerning insurance expirations, the data necessary to solicit renewals.[31] Thus, MAIA argues that when an insurer solicits a driver for a voluntary renewal under the MAIP Rule 30.C "take out" procedure, the insurer makes unlawful use of insurance expirations. Second, MAIA contends that the rule violates the insurers' statutory obligation to continue to pay agents commissions because MAIP Rule 30.C was promulgated "pursuant to" the residual market plan. G. L. c. 175, § 113I. That is, MAIA asserts that a policy written according to the requirements of a MAIP rule — even a rule regulating the removal of the policy from MAIP — remains inextricably linked to the residual market. Therefore, MAIA concludes that the obligation to pay a commission necessarily continues.

MAIA's description of the workings of MAIP Rule 30.C is largely correct. The rule does permit MAIP insurers to use insurance expirations to solicit voluntary renewals and does contemplate direct insurer-driver relationships where agents once acted as commissioned intermediaries. However, for the reasons we next discuss, we disagree that the two statutes on which MAIA relies apply to the process by which a policy is "taken out" of the involuntary market.

iii. *Independent agents' ownership and exclusive right to use insurance expirations.* The data necessary to solicit insurance policy renewals are contained in "insurance expirations." See note 31, *supra.* When insurance agents operate as independent contractors, their interest in insurance expirations is vital. See 1 G. Couch, Insurance, § 57:59, at 57-114 (3d ed. rev. 2009). Without an exclusive right to use that information, agents effectively would cede their renewal business to insurers as soon as the agents submit applications. That is, an insurer might accept new business from an agent, pay the agent a commission for that work, but then, at the end of the policy, offer the policyholder a renewal directly, sidestepping the agent. To mitigate this risk, over time traditional agency rules in many States have

---

[31] " 'Expirations' or 'book of business' refers to a list of policies or copies of policies which show the name and address of the insured, a description of the article insured, expiration date of the policy, premium, and all other information necessary to execute an insurance contract." 1 G. Couch, Insurance, § 57:59, at 57-113 to 57-114 (3d ed. rev. 2009). The information is vital for soliciting renewals.

yielded to rules specific to the insurance agent-insurer relationship. These rules, known as the American agency system, give agents privileged rights to insurance expirations over the insurers with whom they contract. See, e.g., *Woodruff* v. *Auto Owners Ins. Co.*, 300 Mich. 54, 58-60 (1942); *Garrett* v. *American Family Mut. Ins. Co.*, 520 S.W.2d 102, 112 (Mo. Ct. App. 1974); *Matter of the Estate of Corning*, 108 A.D.2d 96, 99-100 (N.Y. 1985); 1 G. Couch, Insurance, *supra* at § 57:58, at 57-112. The first sentence of G. L. c. 175, § 162F, is consistent with this trend. It provides, in pertinent part:

> "A duly licensed agent or a duly licensed broker doing business pursuant to the so-called American agency system, other than that of an employer to employee relationship, shall own and have an exclusive right to use certain insurance information contained in insurance policies, certificates of insurance or a written memorandum of a preliminary contract of insurance issued by said agent or broker, embodying the records of an insurance agency which shall include but not be limited to the policy inception date, the amount of insurance coverage, the policy number, the name of the insurance company, the name of the insured, the amount of insurance premiums and the terms of insurance."

The nonexhaustive list of data enumerated in the statute is consistent with the meaning of "insurance expirations." See 13 E.M. Holmes, Appleman on Insurance § 98.10, at 770 (2d ed. 2003). Thus, under § 162F, an independent agent possesses the exclusive right to make use of insurance expirations provided the agent is "doing business pursuant to the so-called American agency system." In the context of this case, we must determine whether agents who file applications to MAIP are doing business pursuant to the American agency system.[32]

---

[32]Neither MAIA nor the commissioner addresses this issue. MAIA argues that agents have a vital interest in insurance expirations, and it correctly asserts that G. L. c. 175, § 162F, protects that interest. However, MAIA does not address the fact that the statute's protections are conditional and, as such, MAIA misses the predicate inquiry whether the agents at issue in this case are eligible for these protections. For her part, the commissioner engages in an argument based on "common sense." However, her position ignores the special practices surrounding insurance expirations and, as a result, is incongruent with the statute.

The Legislature has used the phrase "so-called American agency system" in several statutes. See G. L. c 175, §§ 113B, 113H, 162D, 162E, 162F. In some instances, the Legislature includes it to modify "independent insurance agents." See G. L. c. 175 § 113H (D) (applying rules to "companies which do business through independent insurance agents pursuant to the so-called American Agency System"). See also G. L. c. 175, §§ 162D, 162E. The phrase is also sometimes followed by a clause which distinguishes the American agency system from insurers and agents who operate pursuant to the "employer to employee relationship" or "designated producers." See G. L. c. 175, §§ 162D, 162E, 162F. Therefore, in Massachusetts, an agent who does business pursuant to the American agency system is not an employee agent or an exclusive agent; such an agent is an independent producer and thus "free to sell insurance products through more than one company." *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 418 (1986).

However, in order to invoke the special protections provided to agents under the American agency system, more is required than the freedom to solicit business on behalf of multiple insurers; the origin of that independence is also important. The American agency system is not free standing. It is a specialized canon of interpretative principles that applies to *contracts* between agents and insurers, resolving in agents' favor any silences or ambiguities concerning the ownership of insurance expirations. It has no application outside the agency contract.[33] The purpose of the first sentence of § 162F — plain from the

---

[33]The existence of an agency contract is presumed in cases that discuss the American agency system. For example, the court in *Ballagh* v. *Polk-Warren Mut. Ins. Ass'n*, 257 Iowa 1334, 1337 (1965), stated:

> "[The] American Agency System is the term applied to the principle agreed upon generally by insurance companies and independent agents relating to the ownership of expirations. It provides that *upon termination of an agency agreement*, if the agent has promptly accounted for and paid over premiums for which he is liable, his records and the use and control of the expirations shall remain his property and be left in his undisputed or undisturbed possession; otherwise the records and use and control of expirations shall be vested in the company" (emphasis added).

Similarly, a leading treatise begins its discussion of the rights of agents by stating that "the insurance agency system does not reliably exist . . .

language of the statute — is to codify the interpretive presumption of the American agency system.[34]

Independent agents who submit applications to MAIP may have contracts with multiple insurers in the voluntary market. If such contracts are ambiguous or silent on the subject of insurance expirations, they will be interpreted in the agents' favor pursuant to § 162F. However, the random assignment process of MAIP does not create a contract between a particular agent

independently of the 'insurance agency contract' that governs the mutual conduct of insurers and agents. In other words, the insurance agency contract reifies and gives tangible existence to the American insurance agency institution." 13 E.M. Holmes, Appleman on Insurance, *supra* at § 95.1. Therefore, the principles of the American agency system are relevant insofar as they are explicit in contracts or are implied in contract by virtue of long-standing custom and usage. See *Ballagh* v. *Polk-Warren Mut. Ins. Ass'n*, *supra* at 1337-1340; *Matter of the Estate of Corning*, 108 A.D.2d 96, 99-100 (N.Y. 1985); 1 G. Couch, Insurance, *supra* at § 57:59, at 57-116 to 57-117 (custom and usage must be universal, uniform, and long-standing).

Only one case from Massachusetts and two Federal cases arising from Massachusetts make reference to the American agency system. All three are consistent with requiring the existence of a contract as a predicate to applying the principles of the American agency system. See *Nationwide Mut. Ins. Co.* v. *Commissioner of Ins.*, 397 Mass. 416, 418 n.2 & 420 (1986); Gotchis *vs.* Allstate Ins. Co., U.S. Dist. Ct., No. 90-12553-Y (D. Mass. Feb. 19, 1993), appeal dismissed, 16 F.3d 12 (1st Cir. 1994); *Roy A. Dart Ins. Agency, Inc.*, 5 B.R. 207, 210-211 (Bankr. D. Mass. 1980).

[34]The second sentence of G. L. c. 175, § 162F, has a different purpose, although it was added at the same time as the first. See St. 1988, c. 229. It provides:

> "Any bank, lending institution, mortgage company, or mortgagee . . . or any loss payee who obtains [insurance expirations] as evidence or proof of insurance shall be prohibited from using, selling, or transferring said insurance information to any third party for the purpose of marketing, underwriting, or soliciting insurance."

The origin of this language was a legislative controversy in 1988 when the Legislature considered two bills that would have permitted bank employees to sell insurance. See 1988 House Doc. No. 317; 1988 Senate Doc. No. 36. Concerned for their livelihoods, insurance agents strongly opposed the bills, see Banks and Banking, State House News Service, Mar. 1, 1988, and the bills were not acted on. See 1988 House Doc. No. 5608. Section 162F was introduced into the Legislature on June 15, 1988, just three months later. See 1988 House Doc. No. 401. This juxtaposition informs the meaning of the second sentence of § 162F. It is designed to prohibit banks, which may obtain insurance information from their customers in conjunction with bank services, from taking that information and using it to sell the customers other policies.

and an insurer; there is no agreement between them. Without a contract, there is nothing to which to apply the principles of the American agency system. Consequently, § 162F has no bearing on the noncontractual relationship between an agent and an insurer.

iv. *Independent agents' right to commissions.* MAIA next argues that insurers must continue paying agents commissions for policies that have been removed from the residual market according to MAIP Rule 30.C. It contends that "fair and reasonable" commissions are due to agents under G. L. c. 175, § 113I, because insurers who take advantage of the rule to offer voluntary renewals are acting "pursuant to the plan approved under [§ 113H]." This argument misinterprets the meaning of "pursuant to" in the statute. That language only requires insurers to pay commissions for policies written in the residual market.

Section 113I states that nothing in G. L. c. 175 shall "abridge or restrict the freedom of contract between insurers and agents . . . except that insurers shall, pursuant to the plan approved under [§ 113H], be required . . . to pay a fair and reasonable commission to any . . . agent designated as the producer[] of record by applicants for insurance or renewal thereof." The statute thus requires the residual market plan to include a provision for the payment of commissions for policies insured in that market. MAIP currently meets this mandate in the form of MAIP Rule 37, which sets commissions at the average percentage commission paid by the insurer for policies it insures voluntarily. Nothing more is required by the language of § 113I. The "take out" procedure does not implicate the statute because § 113I does not apply to policies that are no longer insured in the residual market.

General Laws c. 175, § 113H (D), first par., which we must address because it operates in tandem with § 113I, does not offer MAIA any greater assistance. The first paragraph of § 113H (D) requires commissions to be paid for "business insured through" the residual market plan. Although "through" may mean "as a result of" or "because of," Webster's Third New Int'l Dictionary 2384 (1993), a more limited reading is compelled by the fact that the language appears within a subsection of § 113H, the statute that authorizes the creation of the residual market. Consistent with its context, the subsection's scope is defined by the boundaries

of the residual market, and "business insured through" MAIP is limited to policies that are written *within* the residual market.

Finally, by MAIA's argument the only way for an agent to lose a commission once the agent submits an application to the MAIP would be for the agent's client, the driver, to terminate the relationship. In other words, for as long as the driver remains a client of the agent, the insurer would be required to pay the agent a commission in perpetuity even though the driver no longer qualifies for coverage in the involuntary market. This interpretation is at odds with the purpose behind G. L. c. 175, § 113H, to create a secondary, residual market for insurance for drivers who are unable to obtain insurance voluntarily. See *Commerce, supra* at 486 (G. L. c. 175, § 113H, distinguishes between insurance coverage available under residual market plan and coverage available through voluntary market). Without the residual market, many Massachusetts citizens would be unable to operate a motor vehicle because one must carry automobile insurance in order to do so. See G. L. c. 90, § 34J. The goals of the legislatively-created residual market are satisfied when the driver qualifies to leave it. It would be illogical to extend the protections afforded to agents for the part they play in serving the residual market, namely commissions, long after the residual market becomes unnecessary to protect the interests of the driver.

The take out provision prescribed by MAIP Rule 30.C is novel, and it is unlikely the Legislature anticipated such a rule. However, we will not substitute our judgment for the commissioner's unless her actions are inconsistent with the applicable statutes — which we have concluded they are not. See *Massachusetts Med. Soc'y v. Commissioner of Ins.*, 402 Mass. 44, 62 (1988). If the system resulting from the commissioner's regulatory creativity is unwelcome, MAIA's proper recourse is legislative, not judicial.

3. *Conclusion.* The case is remanded to the Superior Court where judgment on the pleadings is to be entered in favor of the commissioner regarding all three counts.

*So ordered.*