In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2250

ELIZABETH CUNNINGHAM and
ESTATE OF LOUISE CUNNINGHAM,

*Plaintiffs-Appellants*,

*v.*

NATIONSCREDIT FINANCIAL SERVICES CORPORATION
d/b/a EQUICREDIT CORPORATION OF ILLINOIS,[Œ]
LOAN CENTER, INCORPORATED and MARVIN HUNTER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 4810—**Ruben Castillo**, *Judge.*

ARGUED JANUARY 12, 2007—DECIDED AUGUST 14, 2007

Before POSNER, WOOD, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Elizabeth Cunningham and her
mother refinanced their home and paid more than $10,000
of their loan proceeds to a company previously unknown to

---

[Œ] Defendant Nationscredit Financial Services Corporation is
the successor by merger to Equicredit Corporation of Illinois,
against which the initial lawsuit was filed. Because Equicredit
is the registered trade name of Nationscredit Financial Services
Corporation, we will refer to this defendant as Equicredit.

them but identified on their loan documents as one of their creditors. The mystery creditor turned out to be a sham company operated by the Cunninghams' loan officer, who pocketed the money himself. Two years after the loan closing, Elizabeth and her mother's estate filed suit, asserting state-law claims against their mortgage broker and home improvement contractor and federal claims against their lender. This appeal is limited to their federal claims and specifically addresses whether the lender violated the Truth In Lending Act ("TILA"), as amended by the Home Ownership and Equity Protection Act ("HOEPA"), by failing to make required disclosures applicable to "high-cost" loans. The question is whether the money stolen by the loan officer should be included in the calculation of the "total points and fees" paid by the loan customer, making this a "high cost" loan within the meaning of HOEPA. The district court said no, and granted summary judgment in favor of the lender. We affirm.

## I. Background

Elizabeth and her mother, Louise, purchased a home in Chicago in 1984; Louise lived there until she died in October 1999. Both women contributed to the monthly mortgage payments, relying primarily on Louise's Supplemental Security Income and later on Elizabeth's Social Security disability benefits.

In February 1999, Elizabeth and Louise decided to refinance their mortgage so they could make home repairs. Elizabeth contacted Marvin Hunter, a contractor, about the repairs, and he recommended Elizabeth contact Derwin Moore to handle the financing. Moore was a loan officer and senior executive at the Loan Center, an Illinois-licensed mortgage broker. He was responsible for taking loan applications, requesting credit checks, preparing

documents to be sent to lenders, and communicating with title companies. His compensation was based on a percentage of the fees paid to the Loan Center for each loan transaction he closed.

Elizabeth met with Moore, who told her she needed a job—she was unemployed at the time—to qualify for a loan. Moore went further, however, and instructed Elizabeth to falsify a Uniform Residential Loan Application. Moore told her to state on the application that she worked at M&M Cleaning Services and was paid $1800 per month (Elizabeth never worked there) and that she graduated from high school (she did not). Elizabeth did so, and signed several additional documents as well, including a Loan Brokerage Disclosure Statement, a Loan Brokerage Agreement, and a Borrower Information Document. Moore decided the Cunninghams should request a loan for $95,200 (Elizabeth was unaware of how he arrived at this amount), with the broker's fee set at 10 percent of the loan amount.

The Loan Center submitted the Cunninghams' loan application in February 1999 to Equicredit, a past lender to Loan Center clients seeking residential mortgage refinancings. Two months later, unbeknownst to Elizabeth, the Loan Center submitted a revised loan application. This unsigned application included additional fraudulent documentation related to Elizabeth's nonexistent employment at M&M Cleaning Services, including fictitious pay stubs and a Request for Verification of Employment form purportedly signed by the manager of M&M. These documents falsely represented that Elizabeth received $45,000 in wages in 1997; $49,500 in 1998; and was on her way to receiving over $53,000 in 1999.

Equicredit approved the loan based on the revised application in late April or May 1999, obviously failing to investigate the information in the Residential Loan

Application and other documents. Meanwhile, Elizabeth obtained several bids for her home-repair work, including a bid from Hunter. He was not the low bidder, but Elizabeth felt obligated to select him because Moore told her that receipt of the loan was contingent on Hunter doing the work. Under this constraint, Elizabeth accepted Hunter's bid of $32,000.

Prior to the loan closing, the title company prepared a Department of Housing and Urban Development Settlement Statement ("HUD-1 Settlement Statement"). This document reflected that a portion of the loan proceeds would be used to pay the Loan Center's broker fee of $6350, which together with other administrative fees, amounted to 7.97 percent of the loan amount. Moore did not explain why the broker fee decreased from the 10-percent rate he initially quoted Elizabeth; however, by keeping the fee under 8 percent, Equicredit was not required to make additional loan disclosures pursuant to HOEPA. At Moore's direction, the HUD-1 Settlement Statement also reflected a $10,500 payment to an entity called D&E Services. D&E Services was not a creditor of Elizabeth's, nor had it ever provided her with any services. Nevertheless, both Elizabeth and Louise signed the Settlement Statement at the loan closing.

Several days after the closing, Moore received the $10,500 check made out to D&E Services, which he promptly endorsed and deposited into his personal bank account. It turns out Moore is the principal of D&E Services, and Elizabeth was not the only borrower who unwittingly paid this entity. In almost all of the Loan Center transactions Moore worked on between April 1998 and October 2000, Moore instructed the title company to include a payment to D&E Services.

Two years after the closing, Elizabeth realized something was awry. In May 2002, Elizabeth's attorney served

Equicredit with a notice rescinding Elizabeth's loan transaction pursuant to 15 U.S.C. § 1635 and requesting that Equicredit return all the money she paid in connection with the loan. That same day, Elizabeth and her mother's estate filed a 13-count complaint in state court against Equicredit, the Loan Center, and Hunter.[1] Equicredit removed the suit to federal court based on federal-question jurisdiction, as two of the counts alleged Equicredit violated TILA by failing to make certain disclosures required for "high-cost" loans. Equicredit moved for summary judgment. The district court granted the motion and declined to exercise supplemental jurisdiction over the remaining state-law claims. Elizabeth and her mother's estate appealed.

## II. Discussion

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the Cunninghams. *Valentine v. City of Chi.*, 452 F.3d 670, 677 (7th Cir. 2006). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

TILA was enacted to protect consumers by requiring lenders to make meaningful disclosures about loans and their costs so "the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer

---

[1] Shortly after the litigation commenced, Elizabeth sold her home because she could not afford the loan payments.

against inaccurate and unfair credit billing." 15 U.S.C. § 1601(a); *see generally id.* §§ 1601-1667f. It was subsequently amended by HOEPA, which requires lenders to make additional disclosures to borrowers of "high-cost" or "high-rate" loans. *See id.* § 1639.

The facts of this case involve multiple parties and give rise to several claims, but the legal question before us is narrow. Specifically, this appeal concerns only the question whether the Cunninghams' loan was "high cost" and thus subject to HOEPA disclosures, which Equicredit concedes it did not provide. A high-cost HOEPA loan is "a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction . . . if . . . the total points and fees payable by the consumer at or before closing will exceed the greater of . . . 8 percent of the total loan amount; or . . . $400." *Id.* § 1602(aa)(1). "Points and fees" include "all compensation paid to mortgage brokers." *Id.* § 1602(aa)(4)(B). The parties' dispute centers on whether the total points and fees paid to mortgage brokers on this loan exceeded 8 percent of the loan amount.[2]

Equicredit argues that because the Loan Center was the only mortgage broker involved in this transaction, the

---

[2] The $400 statutory alternative is not at issue here; it would apply only to very small loans ($400 would exceed 8 percent on loans of less than $5000). Although we have found no cases discussing this alternative, Congress apparently intended to permit mortgage brokers to collect fees of up to $400 for loans of less than $5000 without triggering the enhanced disclosure requirements applicable to "high cost" loans. For example, a mortgage broker processing a $3000 loan would be entitled to fees up to $400 without HOEPA's heightened disclosures kicking in (the alternative statutory measure, 8 percent of $3000, is $240). We also note that the $400 figure is adjusted annually for inflation. 12 C.F.R. § 226.32(a)(1)(ii).

$6350 broker fee it received pursuant to the HUD-1 Settlement Statement represents the total mortgage broker fee paid by the Cunninghams. The Loan Center's $6350 fee, together with several remaining administrative fees disclosed on the Settlement Statement, amounts to 7.97 percent of the Cunninghams' loan—falling short of the 8 percent required to trigger HOEPA disclosures. *Id.* §§ 1602(aa)(1)(B)(i), 1639. The Cunninghams contend the $10,500 payment to D&E Services was a disguised broker fee, considering Moore cashed the check and received its proceeds, and thus should be included in the total points and fees paid to a mortgage broker for purposes of TILA and the enhanced disclosure requirements of HOEPA.

The Cunninghams' argument must be rejected; neither D&E Services nor Moore was their mortgage broker. The HUD-1 Settlement Statement listed D&E Services as a creditor, and the Cunninghams signed the Settlement Statement, confirming that it was an accurate description of how their loan proceeds were to be distributed. The Cunninghams also signed a Loan Brokerage Agreement that made the Loan Center their sole mortgage broker, granting the Center the "exclusive right to negotiate a mortgage loan" on their behalf.

We have said before that TILA "is not a general prohibition of fraud in consumer transactions or even in consumer credit transactions. Its limited office is to protect consumers from being misled about the cost of credit." *Gibson v. Bob Watson Chevrolet-Geo, Inc.*, 112 F.3d 283, 285 (7th Cir. 1997). Equicredit was not required to make HOEPA disclosures because the Cunninghams' loan does not constitute a high-cost loan under 15 U.S.C. § 1602(aa)(1). The legal consequences of Moore's fraud, and the extent to which the Cunninghams must bear responsibility for apparently closing their eyes to it, will have to be sorted out elsewhere.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*