Hines, Geraldine S., J.
Introduction
The Plaintiffs, Joyce and Gerald Powell (“the Pow-ells”), are two of the thousands, if not millions, of Americans who received sub-prime mortgage loans to finance the purchase of a home. They now seek redress for harm caused, they alleged, by the unfair lending practices of their lender, New Centuiy Mortgage Company (“NCMC”). Though NCMC is not a parly to this action[3] and none of the Defendants were directly involved in the underlying mortgage transaction, the Powells assert a myriad of claims related to NCMC’s conduct during and after their mortgage loan transaction. The Powells, claiming violations of statutory and common-law rights, seek rescission of their loan, damages, and attorneys fees.
The matters now before the Court are the motions to dismiss filed by Natixis, Ocwen and Deutsche Bank (“Motion Defendants”). These motions, brought pursuant to Mass.R.Civ.P. 12(b)(6), urge dismissal of all claims for failure to state a claim upon which relief can be granted. After a hearing and consideration of the written submissions, the motions are ALLOWED in part and DENIED in part.
BACKGROUND
The Complaint alleges the following facts, which are taken as true for the purposes of the motions to dismiss. The Powells, who are black, emigrated to the United States from Jamaica. On June 30, 2005, the Powells purchased their first home at 148 Fairmont Street in a Dorchester neighborhood where a majority of residents are ethnic or racial minorities. They financed 100% of the $510,000 purchase price with a purchase money mortgage. The purchase money mortgage consisted of two separate loans: the first loan in the amount of $408,000, with a two-year teaser rate of 7.19% and an APR of9.2288%; and, the second loan in the amount of $102,000, with an interest rate of 10.64% and an APR of 10.8076%. Under these terms, the Powells were obligated to make total payments on the purchase money mortgage loans in the amount of $1,234,647.93 and $246,708.23, or $1,481,356.16 in the aggregate.
In mid-2006, the Powells decided to refinance their mortgages after realizing that the mortgage was unaffordable, given their financial resources. Being unsophisticated in financial matters, they consulted with Kathy Briggs (“Briggs”), a mortgage broker for D.F.C. of Maine, Inc. In the discussions with Briggs, Mrs. Powell requested a refinance loan with both a fixed rate and a lower interest rate than they were then paying. She provided to Briggs documentation of her monthly income in the amount of $4,177.68 per month and her husband’s monthly income in the amount of $1,437.37, including $200.00 per month from a second job as a church custodian. The Powells also documented rental income in the amount of $1300 per month from the first-floor unit in their home. The Powells’ total monthly income was $6,915.05. On the loan application, however, Briggs inflated the Powells’ actual income to $8,023.67. She accomplished this by reporting Mrs. Powell’s salary as $4,754.67 per month and Mr. Powell’s salary as $1919.00 per month and the rental income as $1350.00 per month. Briggs brokered the loan through NCMC, which relied on the sub-prime mortgage loan market for a substantial part of its business.
On March 15, 2006, NCMC issued the Powells a Good Faith Estimate, stating that the loan would be “Fixed 30 Yr Conforming.” On May 2, 2006, NCMC sent the Powells the first set of loan documents offering a loan at a fixed rate of 7.375% and an APR of 7.526%, with a total payment of $1,504,934.29, slightly more than that due on the purchase money mortgage. At the May 23, 2006 closing, however, NCMC offered the Powells a different and more expensive loan than that negotiated with Briggs. Though the Powells had requested and NCMC had promised a fixed rate mortgage in the May 2, 2006 Good Faith Estimate, NCMC now offered an Adjustable Rate Mortgage (“ARM”) loan with an initial two-year “teaser rate” of 7.425% and an APR of 10.469%. These new terms also required a *368 balloon payment in the amount of $362,950.71. The teaser rate is more than 3.5% lower than the fully indexed rate. The total payment due under these new terms was calculated to be $2,107,041.63, an amount $600,000 higher than the original loan promised to the Powells.
At the closing, NCMC failed to make the required disclosures of the Amount Financed, the Finance Charge and the Annual Percentage Rate. Nor did NCMC provide to each of the Powells two copies of the Right to Cancel notice required in loan transactions secured by the borrowers’ principal residence. Lastly, Briggs told the Powells that the loan was conditioned upon their agreement to increase the principal amount to pay off pre-existing credit card debt. The Powells agreed and NCMC added $9,285 to the total amount of the loan. NCMC then charged the Powells an additional $225 for the “service” but did not include these costs, the “credit pay-off’ in the amount of $9,285 and the “payoff service fee” in the amount of $225, as prepaid finance charges.
NCMC disregarded sound underwriting practices and engaged in deceptive practices to sell structurally unfair loans. In the case of the Powells’ loan, the debt-to-income ratio of the fully indexed rate to the Powell’s real income exceeds 70% and the ratio to the inflated income exceeds 60%. The loan-to-value ratio is calculated at 96.35%, assuming the Powells’ home was correctly valued at $549,000 with a loan in the amount of $529,000. These ratios far exceed the generally accepted thresholds in the mortgage lending industry.
Though not directly involved in the underlying loan transaction, the Motion Defendants allegedly engaged in a conspiracy with NCMC and Briggs to market and sell predatory loans to the Powells and other persons of color. According to the Complaint, the Motion Defendants, Ocwen Loan Servicing, LLC (“Ocwen”), the current servicer of the loan, Deutsche Bank, Trustee for Morgan Stanley ABS Capital I, Inc. (“Deutsche Bank”), the purported assignee of the note and mortgage, Natixis Real Estate Holdings, LLC (“Natixis”),[4] the alleged “sponsor” of the trust to which the Powells’ loan was assigned, and Morgan Stanley ABS Capital I, Inc. (“Morgan Stanley”), the alleged “depositor” of that trust, and Kathy Briggs (“Briggs”), the mortgage broker for the loan, accomplished the goal of the conspiracy through the “securitization” of the Powells’ loan and other similar sub-prime loans originated by NCMC. Each of these defendants was a willing and knowing participant in the conspiracy.
The “securitization” process involves a series of related transactions. It begins with a sub-prime mortgage lender like NCMC, but it thrives only through the symbiotic relationship between the lender and other financial entities like the Motion Defendants. Each plays its designated role and each provides a link in the chain of financial services necessaiy for NCMC to profit from its unlawful practices. In return, the Motion Defendants realize substantial profits in proportion to the number of loans originated by NCMC.
The operation is best described by beginning with the loan transaction. NCMC, working through brokers like Briggs, recruits prospects such as the Powells for its loan products. In most cases, as in this case, NCMC makes a sub-prime loan to a borrower who is not financially qualified for the loan. To fund the loans and to hold the loans pending sale or securitization, NCMC uses “credit facilities,” generally in the form of master repurchase agreements, to originate mortgage loans and to hold the loans pending sale or securitization.[5] These “credit facilities,” represented in the Powells’ loan transaction by Natixis and Morgan Stanley Capital, Inc., Eire known in the industry as “Warehouse Lenders.” In the next stage of the transaction, usually within a few months of the closing, NCMC sells the loan to a trust, here Deutsche Bank, as part of a pool of loans. This sale sets in motion the series of transactions that lead to the actual securitization of the package of loans. NCMC, the seller, receives a cash price and residual ownership interest in the trust. The trust raises the cash portion of the purchase price by selling certificates representing a senior interest in the loans in the trust. To complete the circle, NCMC and similarly situated lenders then use the proceeds from the sale or securitization of the loans to pay down the “credit facilities” offered by the Warehouse Lenders and begin the process anew with more such loans.[6] The Powells’ loan was securitized in this fashion by the sale to Deutsche Bank through a series of intermediaries and as part of a preexisting contractual agreement.
Eventually, the Powells consulted with an attorney who assisted them in exercising their right to rescind the loan. They sent demand and rescission letters to Deutsche Bank and Ocwen. These defendants, however, refused to negotiate or take any of the other required actions in response to the rescission notice.
DISCUSSION
I. Motion to Dismiss Standard
A motion to dismiss should be granted when a parly fails to state a claim upon which relief may be granted. Mass.R-Civ.P. 12(b)(6). In deciding a motion brought pursuant to Rule 12(b)(6), the Court must accept as true the Complaint’s well-pleaded factual allegations and any reasonable inferences in the plaintiffs favor that may be drawn from those allegations. Fairneny v. Savogran Co., 422 Mass. 469, 470 (1996). However, the wide berth previously given to plaintiffs in setting forth their claims for relief was narrowed by the Supreme Judicial Court’s decision in Iannacchino v. Ford Motor Company, 451 Mass. 623 (2008). To survive a motion to dismiss under the newly revised standard, the Complaint must state factual allegations “plausibly suggesting an entitlement to relief.” Id. at 636 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 *369 (2007)). The claims must set forth that entitlement to relief “with more than labels and conclusions.” While factual allegations need not be detailed, they “must be enough to raise a right to relief above the speculative level." Id.
Applying these principles, I review the allegations of the Complaint in the context of the legal requirements for each claim pleaded by the plaintiffs. In determining if the Complaint meets the lannacchino standard, I give the plaintiffs the benefit of every reasonable inference that might be drawn from the facts pleaded.
II. Analysis of Claims
A. Count I (Massachusetts Consumer Protection Act, G.L.c. 93A)
To survive a motion to dismiss their G.L.c. 93A claim, the Plaintiffs must allege facts tending to show that the defendants engaged in unfair or deceptive acts or practices and that they suffered damage as a result of those acts or practices. An activity constitutes an unfair or deceptive act or practice if it is “(1) within the penumbra of a common-law, statutory or other established concept of unfairness; (2) immoral, unethical, oppressive or unscrupulous; or (3) causes substantial injury to competitors or other business people.” Morrison v. Toys “r” Us, Inc., 441 Mass. 451, 457 (2004). The plaintiffs must also allege compliance with the notice requirement, more commonly known as the G.L.c. 93A demand letter.
The Powells’ G.L.c. 93A claim relies on two theories of liability: (1) the Motion Defendants’ status as past or present assignees of the loan; and (2) the Motion Defendants’ participation in a conspiracy with NCMC and Briggs. The facts supporting this Count rest in large part on NCMC’s conduct in the underlying loan transaction. In particular, the Powells allege that the inflation of their income to qualify them for a loan NCMC and Briggs knew they could not afford, the funding of a “high cost home loan” in violation of the Massachusetts Predatoiy Home Loan Financing Act (“MPHLFA”),[7] the unilateral modification of the terms offered in the Good Faith Estimate, and the failure to provide the disclosures required by G.L.c. 140D, are all unfair or deceptive acts or practices which violate G.L.c. 93A. The Complaint also alleges that Deutsche Bank’s filing of a foreclosure complaint in the Land Court when the mortgage had not been properly assigned to it was an independent violation of G.L.c. 93A.
The Motion Defendants challenge the viability of this count on both procedural and substantive grounds. Deutsche Bank’s procedural challenge is based on the Powells’ alleged failure to comply with the statutoiy notice requirements. The Powells’ G.L.c. 93A demand letter apparently was sent to an affiliate or subsidiary of Deutsche Bank. The Powells’ un-rebutted response to Deutsche Bank’s challenge is that the notice requirement does not apply because Deutsche Bank did not maintain a place of business in Massachusetts. See G.L.c. 93A, §9(3). Thus, the challenge fails on this ground.
The Motion Defendants’ substantive challenge is that the Complaint fails to allege their direct participation in any of the unfair or deceptive acts or practices and that they cannot be held liable for conduct committed by NCMC.[8] They rely on Cunningham v. Nat’l City Bank, 497 F.3d 714 (7th Cir. 2009), where the court held that the complaint failed to state a claim in the absence of unfair or deceptive conduct committed by the defendant. It is undisputed that the Motion Defendants were not directly involved in the conduct associated with the origination of the Powells’ loan. And the Motion Defendants correctly point out that the Complaint refers without limitation or differentiation to “the Defendants” in pleading the facts. Nonetheless, Cunningham is not dispositive. While it is correct that a party may not be held liable under G.L.c. 93A for conduct it did not commit, the Powells assert vicarious liability against the Motion Defendants on their conspiracy theory. Our law recognizes that co-conspirators can be held liable under G.L.c. 93A for unfair or deceptive acts or practices committed in furtherance of the conspiracy. See Kurker v. Hill, 44 Mass.App.Ct. 184, 190-91 (1998). Thus, as the Pow-ells have adequately stated a claim against Deutsche Bank and Natixis for conspiracy, NCMC’s conduct can be attributed to them. Consequently, they may be held vicariously liable for that conduct under G.L.c. 93A. The motion is allowed, however, as to Ocwen for the reasons stated below in the discussion of the conspiracy count.
B. Count II (G.L.c. 183C, Massachusetts Predatory Home Loan Practices Act and G.L.c. 183, §28C.)
The Powells assert two distinct theories of recovery under this count: (1) violation of the MPHLPA, G.L.c. 183C; and, (2) violation of the Borrower’s Interest Statute, G.L.c. 183, §28C. None of the Motion Defendants has challenged the claim under G.L.c. 183, §28C, so I address only the claim under the MPHLPA.
Under G.L.c. 183C, §3, a borrower in a “high cost home loan” transaction which incorporates any of the practices prohibited under that chapter may bring a civil action for damages or equitable relief. The statute also establishes the right of the borrower to assert against a purchaser or assignee any affirmative defenses or claims the borrower could assert against the original lender. See G.L.c. 183C, §15. The Powells allege that the loan granted to them by NCMC is a “high cost home loan” and that as such, it violated G.L.c. 183C, §§3, 4. They posit that because NCMC funded the loan without a reasonable belief in their ability to repay the loan and without a certification that the Powells had been counseled by an approved third-party credit counseling organization, the Motion Defendants are liable under the MPHLPA.
*370 Deutsche Bank and Natixis are sued in their capacity as former or present assignees of NCMC and presumably as co-conspirators with NCMC and Briggs. Deutsche Bank does not dispute that it is NCMC’s assignee but argues that the Powells’ loan is not a “high cost home loan” and that, as a result, the Powells cannot state a claim for relief under the statute against it. A “(h]igh cost home mortgage loan” is defined by the Act as follows:
a home mortgage loan that meets 1 of the following conditions ... (1) the annual percentage rate at consummation will exceed by more than 8 percentage points for first-lien loans, or by more than 9 percentage points for subordinate-lien loans, the yield on United States Treasury securities having comparable periods of maturity to the loan maturity as of the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the lender; and when calculating the annual percentage rate for adjustable rate loans, the lender shall use the interest rate that would be effective once the introductory rate has expired . . .
G.L.c. 183C, §2.
The Act further prohibits lenders from dividing any loan transaction into separate parts to avoid the terms of the Act. G.L.c. 183C, §17(a). The Compliant alleges that the Powells’ loan was offered with a two-year introductory rate, that the loan would have to be paid off or refinanced at the end of the introductory period and that the loan was purposely structured in this fashion to avoid the obvious characteristics of a “high cost home loan.” Drawing all reasonable inferences from the facts pleaded, I conclude that these facts are sufficient to meet the definition of a “high cost home loan.” In this regard, I am persuaded by the Powells’ argument that the structure of their loan, requiring a pay-off at the end of two years, justifies the amortization of the finance charge over the two-year introductory period and that in doing so, their loan meets the statutory test. Thus, as the assignee of a “high cost home loan,” Deutsche Bank is subject to the claims and defenses that could have been asserted against NCMC under this statute.
Natixis argues that it cannot be liable because it does not presently own the loan and, therefore, it cannot be held liable as NCMC’s assignee. That argument is appealing but trumped by the plain language of the statute which provides, without limitation, that “(a]ny person who purchases or is otherwise assigned a high cost home loan” is subject to the claims or defenses that could be asserted against the original lender. G.L.c. 183, §15. Applying the first rule of statutory interpretation, that a court must give force to the plain language of the statute, see e.g., Arbella v. Comm’r of Ins. 456 Mass. 66 (2010), I agree that the use of the word “any” compels a broader rather than a narrower reach. In addition, this interpretation fosters the underlying policy interests in discouraging the prohibited practices, regardless of when they may have occurred. Therefore, Natixis is subject to the claims and defenses that could be asserted against NCMC and its motion to dismiss on this ground must be denied.
The Complaint is fatally vague as to the basis for Ocwen’s liabiliiy under either of the asserted theories. Ocwen is only mentioned in ¶2, where it is identified as the servicer of the Powells’ loan and in ¶¶111 and 112, where the Powells make the conclusoiy allegations that “the Defendants” engaged in a conspiracy with NCMC and Briggs. Ocwen argues that because it is not an assignee and it is not otherwise liable as a co-conspirator with NCMC, this count must be dismissed as to it on either theory. This court agrees and dismisses this Count as to Ocwen.
C. Count III (Massachusetts Consumer Credit Cost Disclosure Act, G.L.c. 140D)
The Massachusetts Consumer Credit Cost Disclosure Act (MCCCDA), G.L.c. 140D, mandates certain disclosures in a mortgage loan transaction secured by the borrower’s principal residence and provides for damages and equitable relief, including rescission, if the requisite disclosures are not provided.[9] G.L.c. 140A, §10a. The Powells seek both rescission and damages against the Motion Defendants. The factual basis for this Count is the Powells’ claim that NCMC failed to disclose the “proper” finance charges for the loan, including the amount financed, the finance charge, or the annual percentage rate, and failed to provide the requisite number of copies of the Right To Cancel Notice. See Mayo v. Key Financial Services, 424 Mass. 862 (1997); see also Giza, 428 B.R. 266, 271-72 (Bankr.D.Mass. 2010). The Powells allege that the Motion Defendants are liable under MCCCDA for these lapses as past or present assignees of the loan and as co-conspirators with NCMC and Briggs.
Deutsche Bank, the purported current holder of the loan, seeks dismissal of this count on two grounds: (1) that the right to rescind in 209 C.M.R. 32.35 applicable to certain “higher priced mortgage loans” does not apply here; and (2) that the funds provided to pay off the Powells’ credit card debt is not a non-disclosed “finance charge.”[10] The Powells do not rebut this first argument so I address only the second. Citing G.L.c. 140, §4, which provides that the “finance charge does not include charges of a type payable in a comparable cash transaction,” Deutsche Bank argues that third-party debt payoffs are not in fact “finance charges” that must be disclosed to the borrower. See Cunningham v. Nationscredit Finan. Serv. Corp., 497 F.3d at 718. The Powells, however, make a convincing case that in the circumstances of this case, where the loan payoff was not voluntary, this rule does not apply. Conceding that some third-party debt payoffs are “amounts financed” rather than finance charges, the Powells argue that a payoff of a certain sum to a third party, required as a *371 condition of receiving the loan, meets the statutory definition of “finance charge.” They cite the language in G.L.c. 140D, §4(a), defining a finance charge as an amount “payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit.” This court agrees, for the purposes of this motion to dismiss, that the credit card payoff fairly may be treated as a finance charge and should have been disclosed to the Powells and that it is a basis for liability under the statute.
Natixis argues that this claim should be dismissed because the Powells seek rescission and that this relief cannot be granted against it as a non-assignee of the loan. Natixis also argues that this claim should be dismissed because the Complaint fails to allege that the disclosures were facially defective when Natixis received the assignment of the loan. Natixis relies on the provision of the statute requiring a borrower, claiming liability of an assignee of a creditor, to establish that:
(i) the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement provided in connection with such transaction pursuant to this chapter; and (ii) the assignment to the assignee was voluntary. G.L.c. 140D, §33(d)(l).
A violation is apparent on the face of the disclosure statement if:
(i) the disclosure can be determined to be incomplete or inaccurate by a comparison among the disclosure statement, any itemization of the amount financed, the note, or any other disclosure of disbursement; or (ii) the disclosure statement does not use the terms or format required to be used by this chapter. G.L.c. 140D, §33(d)(l).
See Mayo v. Key Fin. Servs. Inc., 424 Mass. at 865.
The Powells disagree, asserting that Natixis is liable as a former assignee and as a co-conspirator for NCMC’s violations of MCCCDA. I am persuaded by Natixis’s argument that the Powells cannot pursue rescission against Natixis as a former assignee and the Powells do not press the issue in their opposition. As to liability for damages, the Complaint is sufficient if it alleges a lapse in the disclosure requirement apparent on the face of the disclosure statement. The issue of the failure to disclose is resolved by the same analysis of Deutsche Bank’s claim that NCMC was not required to report the credit card payoff as a finance charge. Comparison of the disclosure statement and an itemization of the amount financed could lead one to believe the disclosure statement to be incomplete, thereby making the violation “apparent on the face of the disclosure statement.” Therefore, Natixis, as a past assignee of the loan, and Deutsche Bank, as an as-signee of the loan, could both be liable under §33(d)(l) of the MCCCDA. See G.L.c. 140D, §33(d)(l) (liability can be maintained against “any assignee” of a creditor if the violation is apparent on the face of the disclosure statement and the assignment to the assignee was voluntary).
Under c. 140D, §33(e)(l), however, “a servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as an assignee of such obligation for the purposes of this section unless the servicer is or was the owner of the obligation.” As Ocwen is identified as merely the servicer of the loan, Ocwen’s motion to dismiss Count III is allowed.
D. Count IV (Fraud), Count V (Negligent Misrepresentation),
Count VI (Unconscionability), Count VII (Intentional Infliction of Emotional Distress), Count VIII (Breach of the Implied Covenant of Good Faith and Fair Dealing)
All of these common-law tort claims are brought asserting vicarious liability under a conspiracy theory. The Motion Defendants assert that these Counts should be dismissed because none of them were directly involved in the underlying conduct alleged by the Powells. With the exception of count VII for intentional infliction of emotional distress, they do not argue that the alleged facts, even if true, are insufficient to support the claims. Given the court’s ruling on the conspiracy count, the motions must be denied as to Deutsche Bank and Natixis on counts for fraud, negligent misrepresentation, unconscionability and breach of the implied covenant of good faith and fair dealing. Ocwen’s motion to dismiss is allowed as to all counts.
With respect to the count for intentional infliction of emotional distress, I do not recite here the familiar elements of this claim because the Complaint is patently deficient. Granting that the prospect of losing one’s home may cause one to suffer palpable distress, this count simply overreaches. The facts alleged here do not come close to the facts of those cases where the claim is properly asserted. See e.g:, Agis v. Howard Johnson Co., 371 Mass. 140, 145 (1976) (public humiliation); Simon v. Solomon, 385 Mass. 91, 95 (1982) (sewage overflow into tenant’s apartment caused by refusal to make necessary repairs); Boyle v. Wenk, 378 Mass. 592 (1979) (persistent harassment by private investigator). In a case involving remarkably similar facts, the court rejected the claim. See Fernandes, 446 B.R. 6 (Bankr.D.Mass. 2001). In Fernandes, the court held that a bank’s intent to exercise its perceived right to foreclose even though it had no actual right to foreclose, did not state a claim for intentional infliction of emotional distress. Id. at 10-11. Accordingly, Count VII is dismissed for failure to state a claim against Natixis, Deutsche Bank, and Ocwen.
E. Count IX (Discrimination, G.L.c. 151B)
Under G.L.c. 151B, §4(3B), it is unlawful for “[f]or any person whose business includes granting mort *372 gage loans or engaging in residential real estate-related transactions to discriminate against any person ... in the terms or conditions of such a loan or transaction, because of race, color . . . [or] national origin . . .” This Count is brought under G.L.c. 151B, §9 which imposes a one-year statute of limitations for an action filed directly in the Superior Court. The Powells filed this Complaint on May 21, 2010, almost four years after the date of closing, and over a year and three months after the Powells rescinded the loan. Consequently, Count IX must be dismissed all to each of the Motion Defendants.
F. Count X (Civil Conspiracy)
To survive a motion to dismiss on a conspiracy claim, a plaintiff must allege “a common design or agreement, although not necessarily express, between two or more persons to do a wrongful act and . .. proof of some tortious act in furtherance of the agreement.” Aetna Cas. Sur Co. v. P&B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994); see also Bartle v. Berry, 80 Mass.App.Ct. 372, 384 (2011), citing Kurker v. Hill, 44 Mass.App.Ct. at 188-89. The Complaint alleges the goal of the conspiracy was to market, sell and profit from predatoiy loans to unsuspecting and unqualified borrowers like the Powells. To be sure, the Powells dealt only with NCMC and Briggs and the Motion Defendants seize upon that fact in their challenge to the viability of this count. However, their participation in those particular acts is not necessary if the Complaint alleges other conduct in furtherance of the conspiracy. Though it is a close question, the Complaint passes muster on this count.
The Motion Defendants’ conspiracy liability stems from their agreement to provide the financial infrastructure for NCMC’s sub-prime mortgage loan business and their direct participation in the securitization of the Powells’ mortgage loan. These acts are distinct from, but no less important than, the acts attending the origination of the Powells’ loan. The Powells’ loan was solicited and funded as part of a “preexisting contractual agreement” between Deutsche Bank and NCMC for the sale of pools of loans for securitization purposes. NCMC and other sub-prime lenders were obliged to generate a high volume of loans, including the Powells’ loan, which in turn created profit opportunities not otherwise available for Deutsche Bank and Natixis. The Complaint’s description of the securitization model used in this case suggests a level of transparency apparent to all participants. Thus, it is reasonable to infer from the facts that the Motion Defendants knowingly provided the financial backing necessary to guarantee the success of NCMC’s otherwise unsustainable enterprise. Whether the Powells can actually prove the conspiracy they have alleged at a trial, however, is a matter beyond the reach of this motion to dismiss. The motion to dismiss this count must be denied as to Deutsche Bank and Natixis.
Nothing in the Complaint, however, implicates Ocwen in a conspiracy with NCMC or the Motion Defendants. Ocwen is not a conspirator scheme merely because it serviced the Powells’ loan. Unlike the Motion Defendants’ alleged agreement to provide a readily available conduit for loans that might not have been sold under generally accepted underwriting standards, the servicing of a mortgage loan is a more or less generic product to the lending industry. Nor do the Powells allege that Ocwen’s involvement predated the apparent agreement between NCMC and the other Motion Defendants to generate and sell sub-prime mortgage loans. Thus, Count X will be dismissed for failure to state a claim against Ocwen.
ORDER
Based on the foregoing, it is hereby ordered that Ocwen’s motion to dismiss is ALLOWED as to all counts. Deutsche Bank’s motion to dismiss is ALLOWED as to Count IX and DENIED as to Count I, Count II, Count III, Count IV, Count V, Count VI, Count VII, Count VIII, and Count X. Natixis’s motion to dismiss is ALLOWED as to Count III (Rescission) and Count IX and DENIED as to Count I, Count II, Count III (damages), Count IV, CountV, Count VI, Count VII, Count VIII, and Count X.

NCMC filed Chapter 11 Bankruptcy in the United States Bankruptcy Court for the District of Delaware on April 2, 2007. On August 1, 2008, all ofNCMC assets were transferred to New Century Liquidating Trust which assigned the Mortgage and Note to Deutsche Bank in 2008.

The successor to Ixis Real Estate Capital Trust 2007-HE1.

I rely here on the repurchase agreement appended to the Complaint in Footnote 2.

The Powells allege that New Century Liquidating Trust has never assigned the Powells’ note or mortgage. NCMC purported to assign the Mortgage and Note to Defendant Deutsche Bank National Trust Company, as trustee, on December 22, 2008, and filed at the registry of deeds on January 7, 2009. However, at the time of the assignment, NCMC no longer had ownership, possession, custody, or control of these assets. Deutsche Bank, while claiming to be the holder of the mortgage, filed a Complaint for the authority to foreclose in the Land Court which culminated in an Order dated February 17, 2010.

See G.L.c. 183C and G.L.c. 183, §28C.

The Motion Defendants do not address here their liability as assignees.

The MCCCDA is modeled on the federal Truth In Lending Act, 15 U.S.C. §1601 et seq., and our courts interpret the MCCCDA consistently with the federal statute. See Lynch v. Signal Fin. Co., 367 Mass. 503 (1975).

Deutsche Bank does not contend that this claim should be dismissed insofar as it alleges that NCMC failed to provide the requisite copies of the Notice of the Right To Cancel.